PEOPLE v JUILLET

PEOPLE v BROWN

Docket Nos. 76747, 85344. Argued May 8, 1991 (Calendar Nos. 1-2).
    Decided September 30, 1991, released October 1, 1991.

Danny Juillet was charged in the Cheboygan Circuit Court with
    delivery of marijuana and LSD and with separate counts of
    delivery of marijuana and phencyclidine (PCP). The defendant
    was granted a hearing on the question of entrapment. The
    court, Robert C. Livo, J., found that the defendant was not
    entrapped in the first two transactions, but was entrapped in
    the third because he obtained the drugs for a police informant,
    was under the influence of drugs at the time of the transaction,
    and was encouraged to enter the transaction by the undercover
    agent. Thereafter, Juillet pleaded guilty of the marijuana deliv-
    ery charged in the second transaction. The Court of Appeals,
    MacKenzie, P.J., and R. J. Chrzanowski, J. (R. M. Maher, J.,
    dissenting), affirmed in an unpublished opinion per curiam,
    holding that the police did not manufacture the defendant's
    crime by conduct likely, when objectively considered, to induce
    or instigate the commission of the crime by a person not ready
    and willing to commit it, and found no evidence of an exploited
    friendship or overt pressure sufficient to support a finding of
    entrapment (Docket No. 72990). The defendant appeals.

Basil W. Brown was charged in the Ingham Circuit Court with
    two counts of delivery of marijuana, two counts of delivery of
    cocaine, one count of possession of cocaine, and one count of
    possession of marijuana. The defendant moved to quash the
    information, claiming entrapment. The court, James T. Kall-
    man, J., denied the motion. The Court of Appeals, MICHAEL J.
    KELLY, P.J., and CYNAR and SHEPHERD, JJ., denied the defen-
    dant's interlocutory appeal (Docket No. 96380). The Supreme
    Court remanded the case for consideration as on leave granted.
    428 Mich 851 (1987). The Court of Appeals, MacKenzie, P.J.,
    and E. A. QUINNELL, J. (BEASLEY, J., concurring), affirmed,
    holding that while some of the police conduct was merely
    distasteful and other aspects of the investigation were truly
    reprehensible, the police activity did not instigate the crime
    (Docket No. 97840). The Supreme Court denied an interlocutory

appeal, and the defendant pleaded guilty of delivery of marijuana and of less than fifty grams of cocaine. The Court of Appeals, CYNAR, P.J., and SHEPHERD and DOCTOROFF, JJ., affirmed on the issue of entrapment, finding that it was bound by the law-of-the-case doctrine (Docket No. 105863). The defendant appeals.

In opinions by Justice BRICKLEY, joined by Justices RILEY and GRIFFIN; by Chief Justice CAVANAGH, joined by Justices LEVIN and MALLETT; and by Justice BOYLE, the Supreme Court *held:*

Claims of entrapment are to be analyzed under the objective test.

In *Juillet,* the defendant was entrapped, requiring reversal. In *Brown,* the Court of Appeals and the trial court erroneously analyzed the defendant's entrapment claims, requiring reversal and remand for further proceedings regarding the question of entrapment.

Justice BRICKLEY, joined by Justices RILEY and GRIFFIN, stated:

Defendant Brown was not entrapped. Under the objective test of entrapment, the government's activities, although involving questionable conduct, would not have induced a normally law-abiding citizen in Brown's circumstances to commit the crimes with which he was charged. Defendant Juillet was entrapped. The police activity, which was reprehensible in that it manufactured the criminal conduct, had the likely effect of inducing a normally law-abiding person in his circumstances to elevate drug use to that of drug delivery.

The overall purpose of the entrapment defense is to deter corruptive use of governmental authority by invalidating convictions that result from law enforcement efforts that have as their effect the instigation or manufacture of a new crime by one who would not otherwise have been so disposed. In Michigan, entrapment is not a defense that negates an essential element of the crime charged; instead, it presents facts that are collateral to the crime that justify barring the defendant's prosecution. The objective test of entrapment focuses primarily on the investigative and evidence-gathering procedures used by the governmental agents, while the subjective test focuses on the defendant's predisposition or motivation to commit a new crime. Factors of both the subjective and objective tests properly can be considered and utilized to determine if entrapment occurred, because both tests are concerned with the eradication of convictions that result more from law enforcement invention than from law enforcement detection. It is not the purpose of the objective test to determine whether the scheme or plan

used by the police was the best or most effective way to detect criminal behavior. Rather, the purpose is to discourage police conduct that manufactures, induces, or instigates the commission of a crime, rather than simply detecting criminal behavior. As formulated in *People v Jamieson,* 436 Mich 61 (1990), the objective entrapment test must determine whether the police conduct in question had as its probable and likely outcome the instigation rather than the detection of criminal activity.

Although the objective test of entrapment mainly is concerned with the existence of reprehensible police conduct, the willingness of the accused to commit the act, weighed against how a normally law-abiding person would react in similar circumstances, also must be considered in determining whether police conduct rose to a reprehensible level and whether the defendant's conduct was induced by the police. The test bars evidence of the defendant's predisposition, such as prior convictions or activities not related to the circumstances at issue. By applying the similar-circumstances test, a court can avoid dealing with hypothetical situations.

To determine whether governmental activity would induce a normally law-abiding person in circumstances similar to the defendant's to engage in criminal activity, courts should consider, in addition to the defendant's circumstances, governmental conduct that would indicate that the crime was manufactured, including whether there existed any appeals to the defendant's sympathy as a friend, whether the police had reason to target a particular defendant, and whether there were any long time lapses between the investigation and the arrest. Other factors to be considered are whether there were any inducements that would make the commission of a crime unusually attractive to a hypothetical law-abiding citizen, whether there were offers of excessive consideration or guarantees that the acts were not illegal, whether and to what extent any government pressure existed, whether sexual favors were involved, whether any threats of arrest were made, whether there were any government procedures that would tend to escalate the criminal culpability of the defendant, whether there was police control of any informant, and whether the investigation was targeted.

When the defense of entrapment is raised, an evidentiary hearing must be conducted outside the presence of the jury at which the defendant bears the burden of proving entrapment by a preponderance of the evidence. The trial court must make specific findings of fact with respect to the issue of entrapment, and its decision will be reviewed under the clearly erroneous

standard. Only when the defendant can prove that the government agents engaged in activities that would impermissibly manufacture or instigate a crime can the defense of entrapment prevail.

In *Brown*, the defendant should be denied relief. The investigators did not manufacture any crime, but only allowed a course of conduct to continue as it had in the past to obtain evidence of a crime. The police conduct would not have induced a similarly situated defendant, who otherwise was not ready and willing to commit the criminal behavior, to commit such an offense. Thus, Brown was not entrapped, and the judgment of the Court of Appeals should be affirmed.

In *Juillet*, the defendant was entrapped. The police encouraged and were responsible for the instigation of a relationship that previously did not exist and, in the course of doing so, played on a police-manufactured friendship resulting in reprehensibility amounting to entrapment. While the defendant was a drug user, there was no evidence that he ever had been a drug dealer. Juillet's criminal pattern was escalated from that of use or possession of drugs to the delivery of drugs. The circumstances in this case establish the likelihood that a normally law-abiding person in a situation similar to Juillet's, and not otherwise disposed to sell drugs, would have been induced by the investigative techniques employed.

Chief Justice CAVANAGH, joined by Justices LEVIN and MALLETT, stated that the dispositive inquiry under the objective test of entrapment in Michigan is not whether the crime was caused by, or was the product of, the creative activity of law enforcement officials, but whether the crime was committed at the instigation of reprehensible police conduct. While the objective test shifts the focus from the defendant's state of mind to the conduct of the law enforcement officers, the subjective test focuses on the willingness of the accused to commit the act. A key purpose of the objective test is to prohibit police conduct that, in an objective sense, is likely to encourage the commission of crime that would not otherwise have been committed.

In inquiring whether the governmental activity would induce a hypothetical person not ready and willing to commit the crime to engage in criminal activity, the plurality opens itself to confusion and misinterpretation. The term "ready and willing to commit the crime" seems to offer a court the option of considering the state of mind of the accused. However, the court may not consider whether the defendant was ready and willing to commit the crime, but only whether an average hypothetical person would be induced by the police conduct to

engage in criminal activity that such a person would not otherwise have engaged in. The Court must focus narrowly on the specific criminal activity or level of activity with which the defendant is charged and inquire whether the police conduct was so reprehensible that it posed an objective risk of causing a hypothetical person who had not reached that level of activity (even if not spotlessly law-abiding) to do so.

The reprehensibility of police conduct cannot be defined solely by reference to the personality traits of a hypothetical law-abiding citizen; rather, the fundamental principle is that no matter what the defendant's past record and present inclinations to criminality are, or the depths to which the defendant has sunk in the estimation of society, certain police conduct to ensnare the defendant into further crime is not to be tolerated by an advanced society. Law enforcement agents play a debased role when they become the instigators of a crime, partners in its commission, or the creative force behind the illegal scheme. Affording a person an opportunity to commit an offense does not ordinarily constitute entrapment unless the circumstances indicate that such an opportunity normally would not be presented or the mere furnishing of the opportunity requires the police to commit certain criminal, dangerous, or immoral acts.

In both cases, the defendants were entrapped. In *Juillet,* the defendant was entrapped, and his conviction should be reversed. The police informant's conduct toward the defendant posed an objective likelihood of causing an average, hypothetical drug user to escalate the criminal activity to drug dealing that otherwise would not have taken place. The outrageous, immoral, and apparently criminal conduct of the informant, and the lack of meaningful supervision, place this operation well outside permissible bounds.

In *Brown,* because the trial court and the Court of Appeals applied an incorrect legal analysis in rejecting the defendant's claim of entrapment, the decision should be reversed, and the case remanded for a new entrapment hearing and application of the correct analysis. The fact that the defendant was known to have engaged in criminal conduct of the same nature previously, and might have continued to do so, does not excuse the outrageous lengths employed by the agents to induce and orchestrate his continued involvement in crime. A manufactured opportunity to commit crime may constitute entrapment if the mere furnishing of the opportunity requires the police to

commit certain criminal, dangerous, or immoral acts, even though they may not be directed entirely toward the defendant.

Justice BOYLE, concurring in part and dissenting in part, stated:

It is clear that under the objective test neither Brown nor Juillet were entrapped, and that each member of the Court favors a new test for entrapment. Although the lead opinions advocate an objective test, neither endorses a test encompassed within the objective test as set forth in *Sorrells v United States,* 287 US 435, 459 (1932). Moreover, neither the prosecution nor the defendants have been given an opportunity to develop a record that anticipates such a shift in analysis. Neither case fairly can be reversed or affirmed as a matter of law under the tests espoused by the lead opinions. If there was error of law, it was error under the newly formulated tests that the trial courts have not applied and that neither party has had an opportunity to address. Because the parties created records based on the objective test, they are entitled to remand to offer evidence with respect to the new test.

What properly should be adopted is a subjective test for instigation entrapment that permits consideration of all facts and circumstances bearing on whether the government caused the conduct in question and would bar prosecution in those rare cases in which the government's conduct truly is reprehensible. The objective test of instigation should be abandoned. No matter how it is labeled, an instigation test examines the defendant's characteristics. Thus, the inquiry is subjective, and necessarily so. The question is whether the defendant would have committed the criminal act without government encouragement. However, in lieu of the adoption of such a test, the subjective objective test for the causation prong advocated by Justice BRICKLEY is preferable.

The courts should not abandon long-asserted authority to restrain abusive investigative conduct. Because government conduct may be reprehensible, not only because it manufactures crime, but on the basis of the level of misconduct above, a dual view of entrapment that would bar prosecution because of truly reprehensible police conduct and for conduct that instigates or manufactures crime should be adopted. Under such a test, government instigation would be evaluated subjectively by taking into account the defendant's circumstances and the interaction between the government agent and the defendant, and the trial court would determine both issues as a matter of law. Under the objective-misconduct prong, the focus is on the government conduct. The inquiry is whether the government's

conduct falls below an acceptable standard for the fair and honorable administration of justice. The subjective analysis inquires whether law enforcement conduct instigated or created a crime, an inquiry involving an analysis of all evidence bearing on the question, including predisposition. Because this prong considers whether a given act accurately gauges the threat the defendant would pose to society absent police encouragement, the defendant's predisposition is a relevant factor. Such an approach would accommodate the necessity to protect against overzealous law enforcement while preserving the opportunity for defendants who claim that, although the police conduct was tolerable in the objective sense, it was intolerable in light of the particular circumstances.

In *Brown,* the trial court and the Court of Appeals shifted focus from the government misconduct to whether the government instigated the criminal act. In so doing, they overlooked consideration of the government's mistreatment of the informant. The trial court misapplied the objective test, focusing on the defendant's predisposition. This also was error under the merged objective and subjective tests set forth in Justice BRICKLEY's opinion. Under the tests adopted, the trial court should determine whether, on the basis of all the facts and circumstances, the government instigated the defendant's conduct and whether that conduct manifested an exploitation of its informant inconsistent with the proper use of governmental authority. *Brown* thus should be remanded for further proceedings.

In *Juillet,* while the case should be remanded for a hearing regarding whether the defendant was entrapped under the revised standard, there is no evidence suggesting government conduct that was offensive in the objective sense.

Justice GRIFFIN, concurring in part and dissenting in part, also stated that Brown was not entrapped, but even under the objective test explained in the lead opinion, Juillet did not meet the burden of proving entrapment.

Entrapment should not be recognized as a defense unless the circumstances rise to the level of a constitutional due process violation. Unless police conduct in a given situation is so reprehensible as to violate constitutional standards imposed by the Due Process Clause, a person who is guilty of committing a criminal act should not be exonerated by the judiciary simply because it disapproves of conduct on the part of another branch of government. While constitutional limitations must be strictly observed, the defense of entrapment, which has no constitutional base whatever, should be eliminated. Short of that, we

should at least move to the subjective standard for judging entrapment.

*Brown,* reversed and remanded.

*Juillet,* reversed.

173 Mich App 202; 433 NW2d 404 (1988) reversed.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *Joseph P. Kwiatkowski,* Prosecuting Attorney, and *William E. Molner,* Assistant Attorney General, for the people in *Juillet.*

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *Donald E. Martin,* Prosecuting Attorney, and *Paula M. Zera,* Chief, Criminal Division, for the people in *Brown.*

State Appellate Defender (by *F. Michael Schuck* and *Ralph Simpson*) for the defendant in *Juillet.*

*Zolton A. Ferency* for the defendant in *Brown.*

BRICKLEY, J. In these cases we are again faced with the troublesome question of entrapment. We granted leave to appeal, 436 Mich 880 (1990), after adhering to the objective test and applying it in the plurality opinion in *People v Jamieson,* 436 Mich 61; 461 NW2d 884 (1990). We continue to adhere to the principles expressed in *Jamieson* and apply the objective test in determining whether defendants Brown and Juillet were entrapped.

We find that defendant Basil Brown was not entrapped. Under the objective test of entrapment, we cannot say that the government's activities, although involving questionable conduct, would induce a normally law-abiding citizen, in Brown's circumstances, to commit the crimes with which he was charged. Therefore, we would affirm defen-

dant Brown's conviction. We find that defendant Danny Juillet was entrapped. The police activity in this case did have the likely effect of inducing a normally law-abiding person, in Juillet's circumstances, to elevate his drug use to that of drug delivery. Additionally, the police conduct was reprehensible with regard to Juillet in that they manufactured the criminal conduct. Accordingly, we would reverse defendant Juillet's conviction.

### I. FACTUAL BACKGROUND

#### A. *PEOPLE v BROWN*[1]

This case arose when an unidentified informant told Nancy Kalder, a special agent for the Organized Crime and Public Corruption Unit of the Attorney General's office, that a prostitute, Kathryn B. Roberts, had received cocaine and marijuana from Brown.

In a night meeting on October 15, 1985, Kalder and Roberts reached an understanding that Roberts would go to Brown's apartment, as she normally had in the past, and would receive whatever narcotics Brown had available. The narcotics would then be brought back to Kalder as a sample and for possible use as evidence against Brown. The parties agreed that if Roberts completed her part of the bargain, she would be furnished with a place to stay, given some money, and put into a drug rehabilitation program. In fact, Roberts received payments for all her expenses, including a hotel stay, spending money, and rides for any purpose even if not related to the investigation. The Attorney General's office also enrolled Roberts in a rehabilitation program.

---

[1] Because of the excellent factual review by Judge BEASLEY in the Court of Appeals, most of this history is taken from his opinion. See 163 Mich App 273, 279; 413 NW2d 766 (1987). We have only added facts and citations to the record where necessary.

Roberts had been addicted to heroin since 1983 and had used cocaine since 1979. She earned money as a prostitute and previously had been charged at least twice for and had one charge of solicitation pending. After meeting Brown through another prostitute, Roberts was involved with him for over four years. She went to Brown's apartment at least fifty times as a prostitute and shared drugs with him on many occasions. The only times they did not share drugs were when none were available. Roberts and Brown also exchanged sex or cash for drugs; however, the record does not indicate how many times or how much Brown paid Roberts for her sexual services.

At the time of her first meeting with Kalder on October 15, 1985, Roberts had not contacted Brown during the previous thirty days, and Brown had not called Roberts within the last six months, apparently because he no longer had a phone number through which he could reach her. The reason for the thirty-day lapse was Roberts' failure to return $130 she received from Brown for the purpose of buying cocaine for him. However, during their four-year illicit relationship, it was not unusual for them not to contact each other for long periods of time.[2] When they first met, Brown even told Roberts never to come to his apartment without calling first. Consequently, she always called Brown before going to his apartment, except for a brief time when she was living with her ex-husband and Brown called her. Sometimes Roberts made several telephone calls before Brown would tell her to come over to his apartment.

On October 17, 1985, Agent Kalder asked Roberts to call Brown and inform him that she had $50 as a partial payment for the money that she

[2] In this instance, it was thirty days between contacts; however, during their relationship, there were interruptions of longer duration.

had stolen from him and would come to his apartment to repay the money. Roberts then called Brown, and he readily agreed to her suggested meeting. Special Agent Kalder gave $50 to Roberts to partially repay Brown for the $130 obligation. Kalder thought that this payment would ensure Roberts' entry into Brown's Lansing apartment.

Before she went to Brown's apartment, the investigators strip-searched Roberts to make sure that no drugs were taken into Brown's apartment, and strip-searched her again after she returned to ensure that she had not taken any drugs out of his apartment other than those that she handed over to Kalder. Roberts testified that when she entered Brown's apartment, he asked her if she wanted to roll them a joint, and that the marijuana was in his bedroom in a dish. She rolled a joint and both of them smoked it. Roberts and Brown also used some cocaine that Brown had in his apartment. She injected the cocaine with a syringe, going into the bathroom to do so because Brown allegedly did not like to watch her use the needle.[3] During this visit, as she had in the past, Roberts traded sex for the drugs given to her by Brown. Although they knew this type of conduct occurred frequently, the investigators allowed it to continue on this occasion because they wanted everything to appear as it always had during Roberts' longstanding illicit relationship with Brown. When she left Brown's apartment, he gave Roberts a small butt of marijuana to take with her to smoke at home. She gave that marijuana to Kalder.

Through a number of telephone calls, a second visit to Brown's apartment was arranged for

[3] Testimony during a *Turner* hearing indicated that although Kalder did not give Roberts any syringes, Kalder allowed her to carry a syringe into Brown's apartment on at least two occasions so that Roberts could inject cocaine in a manner in which she had normally done it. *People v Turner,* 390 Mich 7; 210 NW2d 336 (1973).

October 29, 1985. Roberts made the telephone calls to Brown to set up meetings with him in the same manner that she had for the preceding four years. During one phone call, as with the other phone calls requested by the Attorney General's office, Roberts asked Brown if she "could stop by and smoke a joint with him." Brown agreed to see Roberts. Roberts was again strip-searched before she entered Brown's apartment. Brown asked her if she wanted some cocaine, she agreed, and he gave her cocaine to take into the bathroom to inject. Roberts injected some of the cocaine, but put the rest into her purse to give to Kalder.

Another trip to Brown's apartment was arranged for November 7, 1985. As before, the investigators strip-searched Roberts before she entered the apartment. She said that Brown was smoking when she arrived and asked her if she wanted to roll them a joint. She rolled one out of some marijuana that was on defendant's dresser and they both smoked it. Roberts and Brown also used some cocaine. Brown snorted the cocaine, and she went into the bathroom three times to inject it. In return for the drugs, Roberts again gave sexual favors to Brown. Roberts put some of the cocaine that Brown had given her into an envelope in her purse and carried it out with her when she left. Roberts gave the envelope to Special Agent Kalder.

On the basis of these contacts, a search warrant and an arrest warrant were signed by a magistrate on November 8, 1985, and Brown was charged in four lower court files.

On March 27, 1986, Brown filed a motion to quash the information in Ingham Circuit Court. The motion focused on the entrapment issue, but also contained several other matters not before us on appeal. Ingham Circuit Judge James T. Kall-

man heard the motion and denied it in an opinion and order dated June 4, 1986.

The Court of Appeals initially denied Brown's interlocutory appeal on December 19, 1986, but we remanded the case for consideration as on leave granted, 428 Mich 851 (1987). The Court of Appeals affirmed Judge Kallman's findings. The Court said that some of the police conduct in this case was "merely distasteful." 163 Mich App 273, 275; 463 NW2d 766 (1987). However, it found other aspects of the investigation "truly reprehensible," including using a known drug addict, allowing her to commit sexual acts with the defendant, and allowing the informant to "engag[e] in a meretricious relationship with the defendant." *Id.* at 276. Nevertheless, the Court of Appeals found that although the police "caused" the informant's contact with the defendant in a broad sense of the term, Brown was not entrapped because the police activity did not instigate the crimes. *Id.* at 277. Judge Beasley concurred, noting that because Brown did not testify, the Court had to accept the testimony of Roberts regarding their past relationship. *Id.* at 295. On the basis of the evidence presented, Brown did not prove that the police had "instigated" the crimes charged, and he failed to meet his burden to prove entrapment. *Id.* at 295-296.

After an interlocutory appeal to this Court, which we denied, and a subsequent conditional plea to an October 17, 1985, delivery of marijuana, MCL 333.7401(1), (2)(c); MSA 14.15(7401)(1), (2)(c), and an October 29, 1985, delivery of less than fifty grams of cocaine, MCL 333.7401(1), (2)(a)(iv); MSA 14.15(7401)(1), (2)(a)(iv), Brown filed an appeal of right. The Court of Appeals again reviewed his conviction, 173 Mich App 202; 433 NW2d 404 (1988) (*Brown II*), finding that it was bound by the

law of the case doctrine and thereby affirming the prior panel's findings on the issue of entrapment. *Id.* at 209-210. We granted leave to appeal.

### B. *PEOPLE v JUILLET*

While only the second of three drug transactions is at issue here, we find it helpful to look at all the circumstances surrounding that charge. On September 8, 1982, Juillet was charged with delivery of marijuana and LSD. MCL 333.7401(1), (2)(b), (2)(c); MSA 14.15(7401)(1), (2)(b), (2)(c). Juillet was also charged with separate incidents of delivery of marijuana and delivery of PCP (phencyclidine). MCL 333.7401(2)(b); MSA 14.15(7401)(2)(b). After being bound over for trial on all charges, Juillet requested and obtained a *Turner* hearing on the question of entrapment. Subsequent to Juillet's hearing, the trial court ordered that his hearing be supplemented by a more extensive record in a related case. From the record of these hearings, the following facts can be found.

This case initially began when Ronald Bleser, a police undercover informant, moved to the Cheboygan County area on January 12, 1982. Bleser attempted to become part of an alleged "drug subculture" in the Cheboygan area and became known as a user and supplier of narcotics. The Michigan State Police, who were directed to the Cheboygan area by a number of unknown sources, hired Bleser. The Michigan State Police and Cheboygan County paid Bleser for his services and any other expenses that he incurred as an informant. However, when the police paid Bleser, he did not have to account for his use of the money. Bleser, in addition to covering his living expenses, also used the money to purchase alcohol for minors, a fact known by the police, and for the illegal purchase of drugs for his own use.

During the investigation, the police never attempted to determine what activities Bleser was involved in during the course of the investigation. The police officers also failed to thoroughly inspect Bleser's apartment to determine if he ever possessed or sold drugs. Additionally, the police officers were never instructed to investigate Bleser's conduct in the event they learned that he may have been involved in criminal activities.

Bleser continually provided drugs and alcohol for parties that occurred at his apartment. One store owner indicated that Bleser usually came into the store a number of times a week and purchased substantial amounts of alcohol. Bleser kept large amounts of alcohol and a tray filled with marijuana in his apartment for all to use. He also possessed and ingested drugs, and may have supplied drugs to Juillet as well as a number of other persons.

During the course of this untargeted undercover operation, Bleser initially encountered Juillet sometime during the last two weeks of January when he inadvertently met him walking down a road. Bleser offered to buy some beer for the two of them and, later, when Juillet was intoxicated, Bleser asked him for some marijuana. Juillet stated that although he had some marijuana, it was not for sale. Bleser continued to ask Juillet for marijuana, and when Juillet finally obliged, Bleser, without Juillet's asking, gave him a couple of dollars to cover the cost, lit the marijuana cigarette and smoked it. After that day, every time that Juillet saw Bleser, which was just about every day, Bleser asked Juillet for drugs.

In the first transaction with which Juillet was charged, which occurred approximately two weeks after their first meeting on February 1, 1982,

Bleser and an undercover officer went to Juillet's residence where Juillet stated that he knew someone who had some drugs, and the undercover officer replied that he was interested in making a purchase. Juillet took the officer to another location, where they parked. The officer gave Juillet $50, and Juillet left the vehicle. However, Juillet soon returned and gave the $50 back, indicating no drugs were available. The officer then asked if Juillet could get him some marijuana. Juillet directed the officer to a second location where the officer parked his vehicle. The officer again gave Juillet $50, and Juillet got out. When Juillet returned he simply said "not home" and directed the officer back to Cheboygan. In town, Juillet saw someone he knew and got out of the car again. When Juillet returned he delivered one ounce of marijuana to the officer and kept the $50 the officer had already given him at the second location as the purchase price.

In a second charged transaction, which is the basis of the charge at issue and which occurred on or about March 2, 1982, Juillet was at Bleser's apartment. Bleser said a friend of his was coming from out of town and asked if Juillet could get his friend some drugs. Later, when Bleser and an undercover officer posing as Bleser's friend drove past a local arcade in Cheboygan, Juillet flagged them down and came over to the officer's vehicle. Juillet said there was a man named "Bob" at the arcade who had marijuana and LSD for sale. Bleser asked what Juillet wanted to do, and Juillet replied, "Let's meet at your apartment in about five minutes." The parties separated, and the officer and Bleser went to Bleser's apartment and waited. About ten minutes later, Juillet, another man named Robert Howell, and a white female appeared at Bleser's door. Howell produced a number

of drugs, including one ounce of marijuana and some LSD, which he delivered to the officer for $70.

In the final charged transaction, which occurred on or about March 24, 1982, Bleser and Juillet were at Bleser's apartment when he asked Juillet to obtain PCP for a close friend, who turned out to be an undercover officer. At the time of the transaction, Juillet was smoking marijuana laced with PCP and was also intoxicated from alcohol.

Juillet admitted that he was a regular user of marijuana and PCP. Juillet also admitted he was willing to get drugs for Bleser and that he previously knew from whom he could get drugs. Juillet was twenty years old at the time he initially met Bleser and only had an eleventh grade education. Furthermore, Juillet indicated that Bleser ingested drugs while in Juillet's company.

At the hearings, Bleser admitted that he had no knowledge that Juillet was ever a drug dealer, that he kept up a friendship with Juillet, and that he was generally acquainted with Juillet.

On March 7, 1983, the trial court filed an opinion on the basis of the evidence presented. While the record is not completely clear, it does indicate that the trial court analyzed all three transactions in the same manner and as if they occurred under the same circumstances.[4] The court found that Juillet was not entrapped in the first two transactions. The trial court ruled that because Bleser did not participate in the actual transactions—even though he initiated the contact with Juillet, provided drugs to Juillet, and set up the trans-

[4] All of the activities used to aggrandize the relationship between the informant and the defendant were not pinpointed in time as they affected each charged offense. We glean from the record that those events were pervasive and continuous from the day that the defendant and Bleser met.

actions—Bleser did not cause the transactions to occur. The trial court felt that the informant's conduct "was not likely to induce a normally law abiding person in Defendant's circumstances to commit the delivery . . . ." The circuit court, however, found that Juillet was entrapped in the third drug transaction, which occurred on or about March 24, because he obtained the drugs for the police informant, was under the influence of drugs at the time of the transaction, and was encouraged into the transaction by Bleser. Subsequently, the prosecution also did not prosecute the first charged drug transaction.

Rather than continue with a bench trial that began on March 9, 1983, on March 11 Juillet pleaded guilty of the marijuana count, which was part of the second charged transaction, in exchange for dismissal of the LSD count. Juillet was sentenced to a three-year term of probation with one year to be served in the Cheboygan County jail. In setting Juillet's sentence, the trial court noted that factors influencing the court were Juillet's "70 I.Q., the fact that you're on General Assistance and have been receiving psychological counseling in the past."

The Court of Appeals affirmed Juillet's conviction. Unpublished opinion per curiam of the Court of Appeals, decided June 5, 1985 (Docket No. 72990). The Court of Appeals held that "the police or their agents [did not] manufacture[ ] defendant's crime by conduct likely, when objectively considered, to induce or instigate the commission of the crime by a person not ready and willing to commit it." Slip op, p 1. The Court of Appeals found no evidence of an exploited friendship or overt pressure sufficient to support a finding of entrapment. From this opinion, Juillet appealed.

## II. THE ENTRAPMENT DEFENSE

### A. PURPOSE AND HISTORY

The overall purpose of the entrapment defense is to deter the corruptive use of governmental authority by invalidating convictions that result from law enforcement efforts that have as their effect the instigation or manufacture of a new crime by one who would not otherwise have been so disposed. *People v D'Angelo,* 401 Mich 167, 174; 257 NW2d 655 (1977); *People v Turner,* 390 Mich 7, 16; 210 NW2d 336 (1973); *People v Sinclair,* 387 Mich 91, 116-120; 194 NW2d 878 (1972). In Michigan entrapment is not a defense that negates an essential element of the charged crime. Instead, it presents facts that are collateral to the crime that justify barring the defendant's prosecution. *D'Angelo,* 401 Mich 179.

We previously defined Michigan's entrapment defense:

> "[W]hen the agents' involvement in criminal activities goes beyond the mere offering of such an opportunity, and when their conduct is of a kind that *could induce or instigate the commission of a crime by one not ready and willing to commit it, then—regardless of the character or propensities of the particular person induced—*I think entrapment has occurred. For in that situation, the Government has engaged in the impermissible manufacturing of crime . . . ." [*Turner,* 390 Mich 21 (citing *United States v Russell,* 411 US 423, 445; 93 S Ct 1637; 36 L Ed 2d 366 [1973]) (Stewart, J., dissenting). Emphasis added.]

However, when a defendant is only given the opportunity to commit a crime, or is given aid in furthering an already committed conspiracy so that the government can acquire evidence of that

crime, the defendant cannot claim entrapment as a defense. *People v Smith,* 296 Mich 176, 182; 295 NW 605 (1941).

In applying the entrapment defense, two tests have emerged across the country. Many states and the federal government use a subjective test, while Michigan and a minority of other states follow the objective test of entrapment. In *Jamieson, supra,* we analyzed both federal and Michigan law and determined that we would continue to follow the objective test, which focuses primarily on the investigative and evidence-gathering procedures used by the governmental agents, rather than the subjective test, which focuses on the defendant's predisposition or motivation to commit a new crime. *Id.* at 72.

Under a proper approach, factors of both the subjective and objective tests can be considered and utilized to determine if entrapment occurred. *Id.* at 79. Both tests are concerned with "the eradication of convictions that result more from law enforcement invention than from law enforcement detection." *Id.* at 78. The purpose of the entrapment test is to discourage police conduct that manufactures, induces, or instigates the commission of a crime, rather than simply detecting criminal behavior. *Turner, supra* at 20.

We do not judge whether a particular scheme or plan used by the police was the best or most effective way to detect criminal behavior. *Jamieson, supra* at 82. If we were to decide whether certain types of police conduct were reprehensible because better or more effective ways or techniques to detect criminal behavior were available, we would simply be allowing judges and courts to vent their own personal thoughts and beliefs regarding police investigative practices. However, the objective entrapment test, as formulated in

*Jamieson,* must instead determine whether the police conduct in question has as its "probable and likely outcome the instigation rather than the detection of criminal activity." *Id.* at 77.

### B. ANALYSIS OF THE NORMALLY LAW-ABIDING PERSON

When we analyzed the objective test of entrapment in *Jamieson, supra,* we restated that, although the objective test is mainly concerned with the existence of reprehensible police conduct, consideration must be given to "the willingness of the accused to commit the act weighed against how a *normally law-abiding person* would react *in similar circumstances." Id.* at 74 (emphasis added). We hinged our analysis in *Jamieson* on whether the police conduct in question would induce or cause a *hypothetical person* to engage in criminal activity. *Id.* at 74, 80. By taking into account the reactions of normally law-abiding citizens, we reaffirmed a belief that not all generally offensive police conduct will necessarily support a claim of entrapment. *Id.* at 76.[5]

Our analysis using the normally law-abiding person is not, as was suggested by the dissent in *Jamieson,* a new approach to the entrapment test. Even the Court in *Turner* realized that when reviewing a situation to determine if the defendant was entrapped, a court must consider the defendant's situation and whether his conduct was induced by the police. See *Turner, supra* at 22-23. By applying the term "normally law-abiding person," we were simply restating who could be considered a "person not ready and willing to commit" the crime with which he is charged.

[5] We do not intend to make the entrapment defense simply a "but for" causation analysis. As we indicated earlier, where the defendant is only given the opportunity to commit a crime, no entrapment exists. *Ante,* pp 52-53.

Under the *Jamieson* analysis, the court can review the circumstances of the defendant to determine whether the police conduct would induce a similarly situated person, with an otherwise law-abiding disposition, to commit the charged crime. The circumstances of the particular defendant may be considered by the trial court in analyzing the ready and willing component of the objective entrapment test, as we stated in *Jamieson.*

> We conclude that the furnishing of contraband by the government is insufficient to induce or instigate the commission of a crime by the average person, *similarly situated to these defendants,* who is not ready and willing to commit it. We also note that this is not a case where the government's furnishing of narcotics was for the purpose of trying to *escalate the criminal culpability* of defendants. [*Id.* at 89-90. Emphasis added.]

The trial court is entitled to consider the circumstances in which the defendant was situated in relation to the particular criminal charge brought by the prosecution. The court shall consider the effects of the police conduct upon a normally law-abiding person in the circumstances presented to the defendant, including potential vulnerability.

> On the record before us, the case simply cannot be made that this sixteen-year-old inmate preyed upon the *weaknesses* of his captors to the extent that they would be induced beyond a readiness to make contact with an alleged drug supplier outside the jail and to transport drugs inside the jail to such an inmate. [*Id.* at 85-86. Emphasis added.]

> The targets were *not unwary or vulnerable.* To the contrary, they were trained in law enforcement, sworn to uphold the law, and spent their working days in a most controlled environment in

which they were in charge. The plan to uncover the reported source of drugs in the jail *did not prey on human weakness* (it is hoped that transporting drugs into a jail by correction officers is *not seen as a normal human weakness*) or *friendship* or the use of authority to intimidate. [*Id.* at 93. Emphasis added.]

Therefore, we adhere to the belief that the individual defendant's circumstances are relevant in determining whether the police conduct rose to a reprehensible level.

This test still bars evidence of the defendant's predisposition, such as prior convictions or activities not related to the circumstances involved in the current case. By applying the similar-circumstances test, a court can avoid dealing with hypothetical situations, trying to identify what a "normal" person is and what a "normal" person does. We therefore conclude that a test allowing evaluation of the defendant's circumstances, in light of an otherwise law-abiding disposition, is more in keeping with the purpose of the entrapment defense.

### C. FACTORS INDICATING POLICE-INDUCED CONDUCT

To determine whether the governmental activity would induce a normally law-abiding person in circumstances similar to the defendant's to engage in criminal activity, courts in Michigan and other objective test states have stated a number of types of conduct to consider in addition to the defendant's circumstances that would be found to have manufactured a crime. In *Turner, supra,* we indicated that the court could consider whether there existed any appeals to the defendant's sympathy as a friend, whether the defendant had been known to commit the crime with which he was

charged, and whether there were any long time lapses between the investigation and the arrest. 390 Mich 22-23.

A number of other factors exist which have been considered by various courts to determine if a person in circumstances similar to the defendant's would be entrapped. In addition to the factors indicated in *Turner,* the courts have also considered any inducements that would make the commission of a crime *unusually attractive to a hypothetical law-abiding citizen,* offers of excessive consideration or other enticement, and a guarantee that the acts alleged as crimes were not illegal. *Jamieson,* 436 Mich 73-74. Furthermore, the courts consider whether and to what extent any government pressure existed, the existence of sexual favors, whether there were any threats of arrest made by the governmental agents, and the existence of any government procedures that tend to escalate the criminal culpability of the defendant. *Id.* Finally, the courts have considered the police *control* over any informant, *Jamieson, supra,* whether the investigation is targeted or untargeted, *People v Duis,* 81 Mich App 698; 265 NW2d 794 (1978); see also *State v Anders,* 560 So 2d 288 (Fla App, 1990); *Lusby v State,* 507 So 2d 611, 612-613 (Fla App, 1987) (stating that entrapment may exist when an informant goes on a "fishing expedition" and has no reason to believe that a person has any contact with illegal drugs), and whether an informant or undercover officer was a necessary ingredient in the undercover operation. While this list is not intended to be exclusive, these items are some of the more important factors that courts have considered.

### III. RESPONSE

In response to the opinions of our colleagues, we

think it important, particularly in the matter of the two-part test set forth in the opinion of Justice Boyle, to recapitulate the posture of these cases in relation to the defense of entrapment as it has developed in recent opinions of this Court.

The application for leave to appeal in *Juillet* came to this Court in early 1986 and in *Brown,* in early 1987. Both cases were held in abeyance for resolution of *Jamieson.* Subsequently, while these cases were still in abeyance status and oral arguments had been heard in *Jamieson,* we asked for rebriefing in that case "with regard to whether we should abandon the objective entrapment test in preference to the subjective test." *Jamieson,* 436 Mich 65.

After rebriefing, we decided *Jamieson* in a plurality opinion[6] which candidly set forth what we considered to be the virtues and shortcomings of these two tests as they are in effect in federal courts and other states. Having done so, we concluded that we had not found sufficient reason to depart from precedent and adhered to the objective test.

As evidenced by the ongoing debate in the courts across the land on this question, the entrapment defense benefits from any analysis it can receive. For that reason, we do not lightly dismiss the usual scholarly effort of our colleague, Justice Boyle, which would have us embark on yet another test. However, given the difficulties inherent in a defense that is conceptually alien to tradi-

---

[6] The *Jamieson* opinion was signed by Justices Brickley and Boyle, and Chief Justice Riley, and concurred in by Justice Griffin, who expressed in a separate writing his preference for the subjective entrapment test, but nonetheless stated, "In the meantime, while a Court majority persists in using the so-called objective test for resolution of entrapment claims, I wish to make clear that I prefer, and associate myself with, the version of that test articulated by Justice Brickley." 436 Mich 99.

tional notions of criminal culpability, we must strive for some degree of certainty and finality in this particular area of law.

To require that these two cases go through yet another visit to the lower courts on the basis of a totally new test and another inevitable round of appeals is, we suggest, not in the best interest of either the entrapment defense or the administration of justice.

The opinion of Chief Justice CAVANAGH, to a limited extent, and that of Justice BOYLE, to a greater extent, concern us the most in their efforts to strip the importance of the causality element from the entrapment defense by recognizing that some reprehensible conduct may amount to entrapment without considering the effect on a hypothetical normally law-abiding person. As has been stated by all of us in one way or another, the historical purpose of the entrapment defense is to abate the use of police practices that, in the words of Justice Potter Stewart, a champion of the objective test, are "likely to instigate or create a criminal offense"—not those we do not like, not those that are ineffective, not those that are distasteful. *United States v Russell,* 411 US 423, 441; 93 S Ct 1637; 36 L Ed 2d 366 (1973) (Stewart, J., dissenting). Once the "instigation" component is severed, as my colleagues' opinions would propose, it will, in our view, embark the courts of this state on a review of "all police conduct that can or will in the future, on the basis of the shock level of an individual jurist, be considered 'reprehensible.' " *Jamieson,* 436 Mich 76.

In response to Justice BOYLE's claim that we are altering the objective test for entrapment in these cases, we respectfully note that Justice BOYLE signed an opinion, only one year ago, which not only endorsed continued adherence to the objective

test, but stated "that there is some overlapping in
application between the two tests [objective and
subjective] and that the best of each can, to some
extent, be utilized." *Jamieson* at 79. Similarly, the
assertion that we have, in these cases, adopted the
"defendant's circumstances" as a new standard for
evaluating the claim of entrapment is simply not
true. In *Jamieson* we stated:

> *When applying the objective test,* consideration
> is given to the willingness of the accused to com-
> mit the act weighed against how a normally law-
> abiding person would *react in similar circum-*
> *stances. [Id.* at 74. Emphasis added.]

Therefore, we are clearly not departing from the
current jurisprudence which this Court has es-
poused; any implication to the contrary by Justice
Boyle is an incorrect characterization or interpre-
tation of our opinion.

Finally, we are at a loss to understand the need
for an evidentiary hearing in either case at bar.
Defendant Brown chose not to testify at his en-
trapment hearing, knowing that he had the bur-
den of proof under existing law. In *Juillet,* as
Justice Boyle acknowledges, the "extensive testi-
mony" did not produce evidence that would satisfy
her proposed test for a finding of entrapment.
*Post,* p 105. Furthermore, there is no indication
that either Brown or Juillet were denied admis-
sion of any evidence, and it would be remarkable
if these defendants had not put forth any available
evidence which demonstrated either reprehensible
police conduct or instigation of the criminal activ-
ity and their vulnerability to it. Both of these
factors loom heavily in all existing and proposed
tests for entrapment.

Whatever error was committed by the lower
courts in analyzing the evidence produced for the

record, it represents error of law, correctable in the appellate courts, thus not justifying a remand to the trial court for further evidentiary hearings.

### IV. APPLYING THE ENTRAPMENT TEST

We note that when the defense of entrapment is raised, the trial court must conduct an evidentiary hearing outside the presence of the jury. *D'Angelo,* 401 Mich 183. During this hearing, the defendant will have the burden of proving by a preponderance of the evidence that he was entrapped. *Id.* at 182. In its decision, the trial court must make specific findings of fact on the entrapment issue, and its decision will be reviewed under the clearly erroneous standard. *Id.* Only when the defendant can prove that the government agents engaged in activities that would impermissibly manufacture or instigate a crime will the defense of entrapment prevail. *People v Jones,* 165 Mich App 670, 676-677; 419 NW2d 47 (1988).

### A. *PEOPLE v BROWN*

Initially, we note, as did the Court of Appeals, the unusual nature of this case. We are faced with a situation where the defendant did not testify at the requested *Turner* hearing. Therefore, in reviewing this investigation, we must accept the testimony presented by the prosecutor's witnesses and attempt to determine whether a preponderance of the evidence exists to support the defendant's claim that he was entrapped.

As did the lower courts, we find most troubling and offensive such a misuse of a citizen—the informant—to whom the prosecution is purporting to be helpful. However, our distaste of such behavior toward the informant cannot deter us from the task of determining whether the use of the infor-

mant in this fashion had the effect of causing one not otherwise disposed to commit a crime to do so.[7]

Brown should clearly be denied relief under this analysis. It is simply too much to suggest that one not ready and willing to commit a crime, a normally law-abiding person, would respond positively to the conduct of the police here. The investigators did not manufacture any crime, but only, according to the testimony presented, allowed a course of conduct to continue as it had in the past to obtain evidence of a crime. While the investigators' strategy of using a drug-addicted prostitute to gather evidence of the sale of drugs is offensive, a simple contact by a prostitute to exchange sex for drugs would not successfully importune a normally law-abiding person to deliver drugs to the prostitute.

The relationship constituting the exchange of drugs for sexual favors was the backdrop in which Brown acceded to Roberts, the prostitute-turned-undercover informant. Each knew what was expected of the other. There were no misunderstandings. The only question would be the defendant's willingness to continue the alleged criminal activities. At the time in question, the time of contact between Roberts and Brown, the solicitation was no different than the many offers made in routine purchases and sales by police informants and undercover agents every day on our streets.

Unlike other cases which have found that the defendant was entrapped, there is no suggestion that in the several calls made by Roberts there was any play on sympathy or friendship. *People v Graczyk,* 156 Mich App 632; 402 NW2d 60 (1986);

---

[7] Only in narrow and specified situations is the remedy for police misconduct the overturning of a conviction otherwise lawfully obtained. Again, it is not the function of the entrapment defense to deter all police abuse against all persons in all situations. Its purpose is to deter the manufacturing of crime that would not otherwise be committed by a normally law-abiding person.

*People v Duis, supra; People v Soper,* 57 Mich App 677; 226 NW2d 691 (1975). To be sure, there was an appeal to whatever addictions were borne by the defendant, as there was an appeal by Brown to the addictions of Roberts. Addictions are at the root of the narcotic trade and are not a lawful excuse for crimes committed in their furtherance. Although courts have found that appeals to sympathy for an addict suffering withdrawal symptoms may indicate entrapment, *Graczyk, Duis, supra,* we know of no other court that has suggested, nor would we suggest, that an appeal to an addiction, as such, can be a defense amounting to entrapment.

Entrapment may also be recognized when unusual pressures are placed on the person to succumb to drugs after rehabilitation, when coupled with an appeal to some other factor recognized as an indicator of reprehensible conduct such as sympathy or friendship. See *Turner, supra.* Brown has not testified, nor has he argued, that he was addicted to drugs or that he was attempting to overcome an addiction. Furthermore, it was not drugs which he was seeking in his ongoing relationship with Roberts.

Courts in other jurisdictions have recognized pressure on the informant as a factor supporting an entrapment defense. See, e.g., *Shrader v State,* 101 Nev 499; 706 P2d 834 (1985); *Commonwealth v Wright,* 396 Pa Super 276; 578 A2d 513 (1990). And, in fact, the pressure in this case was on the informant, reinforced by substantial efforts of assistance in solving her problems. We think that the pressure on an informant, while perhaps offensive in its execution, does not amount to pressure on the defendant and does not change the context in which we judge whether the hypothetical or the actual defendant was entrapped.

While there was not a great deal of pressure on the defendant, there was some pressure. Roberts did call Brown to arrange meetings between them. Roberts was also the person who always brought up the use of drugs during discussions. Brown, on some occasions, did protest the informant's appeals, saying he was "busy" and that he did not want to be bothered. Indeed, it sometimes took Roberts several calls before Brown would let her come over to his apartment. However, this pressure did not rise to the level of entrapment. It should be noted that the very first contact between Roberts and Brown, after the thirty-day lapse in communications, ended with Brown agreeing to see Roberts and exchange sex for drugs. One telephone call does not rise to the level of pressure necessary to support an entrapment claim. Furthermore, even Roberts' offer to repay Brown does not support his entrapment claim. While evidence on the record does show that the investigators thought Brown might not see her without the money, this evidence does not indicate that Brown would otherwise have refused to see her or otherwise ended their relationship and does not meet Brown's burden to show entrapment.

As previously indicated, other cases have set forth sexual favors as a factor arguing for the availability of the entrapment defense. See *Jamieson, supra; People v Wisneski,* 96 Mich App 299; 292 NW2d 196 (1980). However, as the facts of the instant case indicate, the Attorney General's office asked this particular informant to resume contact with Brown, it did not initiate the relationship between the informant and defendant, but only allowed an already existing course of conduct to continue, which the police had reason to believe involved criminal behavior. Not only was this relationship already in existence, but there exists

no preponderating evidence to show that the conduct would not have occurred except for the government's intervention. This police conduct would not have induced a similarly situated defendant, who was not otherwise ready and willing to commit the criminal behavior, to commit such an offense. Therefore, we must find that Brown was not entrapped. His convictions, and the judgment of the Court of Appeals on the question of entrapment, should be affirmed.

### B. *PEOPLE v JUILLET*

In this case, we must again undertake a separate analysis of the facts and circumstances presented by the defendant to determine whether the police conduct would have induced or instigated the commission of the crime with which Juillet is charged by a normally law-abiding person. In undertaking this analysis, we again note that the burden is on the defendant to prove by a preponderance of the evidence that he was entrapped by reprehensible police conduct. *D'Angelo, supra.* Here, as in *Brown,* the police were willing to stand by and allow criminal activity to be undertaken by their paid informant. Unlike *Brown,* however, in this case the police encouraged and were responsible for the instigation of a relationship that previously did not exist and, in the course of doing so, played on a police-manufactured friendship. For that reason, which we find to distinguish these two cases, we find reprehensibility amounting to entrapment.

In this situation, we are again cognizant that the defendant frequently used drugs. We must determine whether the facts and circumstances involved in this case would indicate that a normally law-abiding person in Juillet's circum-

stances would be induced into committing the crime charged because of the actions of the police through their paid informant.

The record indicates that Bleser incessantly requested drugs from all those around him, including Juillet. The record also indicates that on at least one occasion, when Juillet could not obtain drugs for the undercover officer and Bleser, the undercover officer drove Bleser and Juillet to at least two other places before Juillet was able to obtain drugs for the undercover officer. Additionally, contrary to the facts in *Brown,* the police did not focus on Juillet as a specific target, the police did not supervise Bleser's activities, and Juillet, a drug user, was convicted for the elevated crime of delivery and sale of narcotics. *Duis, supra* at 702. See also *People v Rowell,* 153 Mich App 99; 395 NW2d 253 (1986) (continuous requests at least two to three times per day to obtain drugs were considered entrapment). Therefore, these factors weigh in favor of Juillet's claim that he was entrapped by reprehensible police conduct.

Unlike *Brown,* the defendant here took the stand during a *Turner* hearing and presented his version of the facts. The record that was prepared indicates that Juillet felt he was Bleser's friend and that he obtained drugs for Bleser because of that friendship. The record also indicates that Bleser stated, on a number of occasions, that he needed to obtain drugs for friends who were coming to visit from another city. This evidence indicates, taking into account Juillet's testimony, that there was indeed an appeal to friendship.

Although the friendship between Bleser and Juillet does not cover a period of years, see *People v Hentkowski,* 154 Mich App 171, 174-175; 397 NW2d 255 (1986) (mere acquaintance is insufficient to support a claim of entrapment), the friendship

lasted several months and they saw each other on a daily basis. The testimony at the *Turner* hearings indicated that Bleser did favors for Juillet, took Juillet out to eat, and had Juillet over to his apartment on numerous occasions. Bleser even met Juillet's parents. These actions would more strongly indicate a friendship to a person of defendant's age and limited education, if not a dependency, than they would to an average person. See *People v Mulkey,* 153 Mich App 737; 396 NW2d 514 (1986). Thus, Juillet's claim of an appeal to his friendship with Bleser is supported by the record.

There also existed police procedures that seemed to escalate Juillet's criminal culpability. The evidence indicated that Juillet was a former and current user of drugs; however, the testimony at the hearings indicated that there was no knowledge by the police, Bleser, or anyone else on the record that Juillet was ever a drug dealer.[8] The evidence also showed that Bleser requested Juillet to find drugs for him on numerous occasions and persuaded Juillet to set up drug transactions with other parties, himself and an undercover officer.

We note that courts have found, under either the objective or the subjective test of entrapment, that when a drug user is convicted for the sale of drugs where no evidence exists that police had knowledge that the defendant was a drug dealer, the defendant was entrapped. *Shrader, supra* at 502-504; *State v Soroushirn,* 571 P2d 1370 (Utah, 1977). Although only one of many factors to con-

_____

[8] In *Jamieson, supra* at 90, we implied that escalation of criminal culpability was an indication of entrapment.

We also note that this is not a case where the government's furnishing of narcotics was for the purpose of trying to escalate the criminal culpability of defendants [citing *People v Killian,* 117 Mich App 220; 323 NW2d 660 (1982)].

sider, Juillet's criminal pattern was escalated from
that of use or possession of drugs to the delivery of
drugs, unlike the circumstances presented in
*Brown.* In this case, the police sent Bleser on a
fishing expedition to find "dealers," and the arrest
of Juillet occurred when neither Bleser nor the
police had any reason to believe that Juillet was
actually selling drugs.[9] This situation is the oppo-
site of that in *Brown,* in which the investigators
had reason to believe that the crimes charged
were actually being committed. This factor also
tends to· support Juillet's claim of reprehensible
police conduct.

A prior alleged sale of drugs made by Juillet
does not require a contrary conclusion. The alleged
sale was also a situation where Bleser asked for a
marijuana cigarette, was given one by Juillet, and
then Bleser paid Juillet back for the cigarette
without being asked for any payment. This situa-
tion simply indicates a drug user being "sociable"
with another drug user as part of a friendship. At
the most, this evidence shows that, under the
circumstances as objectively determined, Juillet
was only a drug user.

It also seems insignificant that Juillet knew
drug dealers in the area. As noted by the prosecu-
tion and the defense, there was a general "subcul-
ture" in the area and the people in that subcul-
ture would seemingly have general knowledge of
the ongoing activities and of the persons involved
in those activities. Therefore, it seems clear that
Juillet was not a drug dealer and that the only
reason for his delivery of drugs to Bleser was the
incessant requests by Bleser and the other activi-
ties undertaken by Bleser to induce Juillet into
committing the crime.

---

[9] This fact is another example of how the police conduct differed
from that in *Jamieson.* "Further, it was not a fishing expedition,
unrelated to specific targets." *Id.* at 91.

We do not understand why the trial court differentiated between the March 2 and the March 24 charges. The circumstances did not change significantly, and the fact that Bleser did not personally participate in the March 2 delivery is not controlling. There were incredible appeals to the "friendship" that existed between Bleser and Juillet, and also appeals to Juillet's sympathy to obtain drugs for Bleser's friends when they came to visit. In fact, all occasions on which delivery charges were brought involved requests by either Bleser or an undercover officer.

The circumstances in this case establish to our satisfaction the likelihood that a normally law-abiding person, *similarly situated* to Juillet *and not otherwise disposed* to the sale of drugs, would have been induced by the investigative techniques here employed.

### V. SUMMARY AND CONCLUSION

Under the objective test of entrapment, we find that the Court of Appeals was not clearly erroneous in concluding that defendant Brown was not entrapped. Considering the circumstances surrounding this investigation and the knowledge under which they were operating, the investigators' conduct would not have instigated or manufactured criminal behavior by a normally law-abiding person. Their conduct merely presented an opportunity for the defendant to continue an illicit relationship.

However, we find that Juillet was, indeed, entrapped. We find that a normally law-abiding person in his circumstances would likely be induced into committing a crime by the situation the police informant presented in this case.

Therefore, we would affirm defendant Brown's

conviction and would reverse defendant Juillet's conviction.

RILEY and GRIFFIN, JJ., concurred with BRICKLEY, J.

CAVANAGH, C.J. I agree wholeheartedly with my Brother BRICKLEY's continued adherence to the objective test for analyzing entrapment claims, which, properly understood, eschews any subjective, case-by-case inquiry into the predisposition, if any, of the individual defendant at bar. I also agree generally with much of the analysis set forth in Justice BRICKLEY's thoughtful opinion, although, as I shall explain, I do not agree with his result in *Brown.*

I disagree with Justice BOYLE that the test established today is a "new test[ ] for entrapment not encompassed in the objective test." BOYLE, J., *post,* p 87. While I myself have some problems with Justice BRICKLEY's analysis, his opinion in *People v Jamieson,* 436 Mich 61; 461 NW2d 884 (1990), represented a logical development in entrapment law, faithful to our precedents, and Justice BRICKLEY's analysis in the instant cases, whatever its problems, is perfectly consistent with his *Jamieson* analysis. Because I view the contours of the objective test somewhat differently than does Justice BRICKLEY, however, I write separately to apply the analysis set forth in my separate concurring opinion in *Jamieson,* 436 Mich 94-97.

### I. THE OBJECTIVE ENTRAPMENT TEST

The historical and doctrinal debate regarding entrapment is longstanding, and I will not attempt to add substantially to it at this point. I simply note that I continue to find persuasive the views of

such distinguished jurists as Justices Louis D.
Brandeis, Harlan F. Stone, Owen J. Roberts, Felix
Frankfurter, William O. Douglas, John Marshall
Harlan, William J. Brennan, Jr., Potter Stewart,
and Thurgood Marshall of the United States Su-
preme Court, and Chief Justice JAMES V. CAMP-
BELL and Justice ISAAC MARSTON of this Court. See
*Sorrells v United States,* 287 US 435, 453-459; 53 S
Ct 210; 77 L Ed 413 (1932) (separate opinion of
Roberts, J., joined by Brandeis and Stone, JJ.);
*Sherman v United States,* 356 US 369, 378-385; 78
S Ct 819; 2 L Ed 2d 848 (1958) (Frankfurter, J.,
joined by Douglas, Harlan, and Brennan, JJ., con-
curring in the result); *United States v Russell,* 411
US 423, 436-439; 93 S Ct 1637; 36 L Ed 2d 366
(1973) (Douglas, J., joined by Brennan, J., dissent-
ing); *id.* at 439-450 (Stewart, J., joined by Brennan
and Marshall, JJ., dissenting); see also *Saunders v
People,* 38 Mich 218, 221-223 (1878) (MARSTON, J.,
joined by CAMPBELL, C.J., concurring).[1] This Court,

[1] *Saunders* is believed to be the first significant exposition of the
entrapment doctrine in American jurisprudence. See *People v Turner,*
390 Mich 7, 15, n 3; 210 NW2d 336 (1973). While the phrases
"objective test" and "subjective test" were not in vogue in 1878 when
*Saunders* was decided, Justice MARSTON's views, joined by Chief
Justice CAMPBELL, clearly foreshadowed the modern *objective* test. He
stated:

> The mere fact that the person contemplating the commission
> of a crime is supposed to be an old offender can be no excuse,
> much less a justification for the course adopted and pursued in
> this case. If such were the fact, then the greater reason would
> seem to exist why he should not be actively assisted and
> encouraged in the commission of a new offense which could in
> no way tend to throw light upon his past iniquities, or aid in
> punishing him therefor, as the law does not contemplate or
> allow the conviction and punishment of parties on account of
> their general bad or criminal conduct, irrespective of their guilt
> or innocence of the particular offense charged and for which
> they are being tried. Human nature is frail enough at best, and
> requires no encouragement in wrong-doing. [*Saunders,* 38 Mich
> 222.]

Justice MARSTON thus put his finger on the key flaw, in my view, of

of course, reaffirmed the objective entrapment test enunciated in the foregoing opinions, as a matter of Michigan law, in *People v Turner,* 390 Mich 7; 210 NW2d 336 (1973), and again just last year in *Jamieson.*

My differences with Justice BRICKLEY's analysis are essentially twofold. First, regarding the causation prong of the objective entrapment test, which forms the heart of Justice BRICKLEY's analysis, I disagree with my colleague's incorporation of aspects of the subjective test, with its focus on the character and circumstances of the particular defendant at bar. Second, while I agree generally that causation is an important element of the objective entrapment test, I do not agree that causation is the be-all and end-all of illegal entrapment. As I stated in *Jamieson:* "The dispositive inquiry under the objective test of entrapment in Michigan is not whether the crime was *caused* by, or was the product of, the creative activity of law enforcement officials, but whether the crime was committed at the instigation of 'reprehensible' police conduct." 436 Mich 94 (emphasis in original).

### A. THE CAUSATION PRONG OF THE OBJECTIVE TEST

With regard to the first point, Justice BRICKLEY in *Jamieson* offered the perplexing statement that "courts applying the objective approach use the state of mind of the accused as a factor. When applying the objective test, consideration is given to the willingness of the accused to commit the act

the subjective entrapment test. By elevating to crucial importance the question whether the defendant at bar, by reason of his past conduct and general character, was "predisposed" to commit the instant crime, the subjective test improperly relies upon bad-character and prior-bad-acts evidence otherwise deemed unfairly prejudicial and generally inadmissible in criminal proceedings.

weighed against how a normally law-abiding person would react in similar circumstances." *Id.* at 74. This troubling dicta was inconsistent with Justice BRICKLEY's otherwise sound exposition of the objective test, which, of course, is designed to "shift [the] focus from the defendant's state of mind to the conduct of the law enforcement officers." *Id.* at 72; see generally *id.* at 72-74. It is the *subjective* test, not the objective test, which focuses (at least in significant part) on "the willingness of the accused to commit the act." As Justice BRICKLEY correctly stated, a key "purpose of the objective test . . . is to prohibit police conduct that is, in an objective sense (*not in individual cases*), likely to encourage the commission of crime that would not otherwise have been committed." *Id.* at 76 (emphasis added).

Justice BRICKLEY settled in *Jamieson* on the following formulation of the objective entrapment test: "The facts of each case must be examined to determine whether, under the circumstances, the governmental activity would induce a hypothetical person not ready and willing to commit the crime to engage in criminal activity." *Id.* at 80. As I noted in *Jamieson,* "[t]he term 'ready and willing to commit the crime' . . . does not necessarily require that a court applying this objective test look to the state of mind of the accused." *Id.* at 94. Quite the contrary: A careful reading of Justice BRICKLEY's own formulation indicates that the court is *not* permitted to consider whether the *defendant at bar* was "ready and willing to commit the crime." Rather, the court considers only the average "*hypothetical person* not ready and willing to commit the crime." Properly understood in light of the true nature of the objective test, I believe Justice BRICKLEY's formulation essentially asks whether the police conduct at issue is, in an

objective sense, the kind that would generally cause the average, hypothetical person to engage in criminal activity that such a person would not otherwise have engaged in.

Unfortunately, the "ready and willing to commit the crime" language has, in my view, sown confusion and lent itself to misinterpretation. The language seems to offer an ever-present temptation to embark down the forbidden path of considering whether the particular defendant at bar was "ready and willing to commit the crime," thus in effect adopting the subjective test's focus on individual predisposition. Thus, in this case, Justice BRICKLEY begins by emphasizing, correctly, that his *Jamieson* analysis "hinged . . . on whether the police conduct in question would induce or cause a *hypothetical person* to engage in criminal activity." *Ante,* p 54 (emphasis in original). And yet my colleague ends up concluding that a court should "*avoid* dealing with hypothetical situations, trying to identify what a 'normal' person is and what a 'normal' person does. We therefore conclude that a test allowing evaluation of *the defendant's circumstances,* in light of an otherwise law-abiding disposition, is more in keeping with the purpose of the entrapment defense." *Id.,* p 56 (emphasis added).

The temptation to permit consideration of defendant Juillet's individual circumstances is great because it so happens that defendant Juillet presents a sympathetic portrait of an unsophisticated twenty-year-old high school dropout who was a drug user, had a low IQ, and was on welfare. See BRICKLEY, J., *ante,* pp 51, 67. Those factors do not generally constitute a legal excuse for criminal acts, however, and are, I believe, irrelevant to a proper application of the objective entrapment test. Whether Juillet was illegally entrapped de-

pends not on whether he, as an individual, was exceptionally vulnerable to entrapment or to the temptations of crime generally (although he undoubtedly was), but on whether the police conduct was so exceptionally reprehensible that (under Justice BRICKLEY's own formulation) it posed the objective threat of causing *the average hypothetical person* (not just Juillet individually) to commit crimes when such a person would not otherwise have done so.[2]

A related source of potential confusion arises from the frequent substitution of the phrase "normally law-abiding person" for "person not ready and willing to commit the crime." See *Jamieson,* 436 Mich 74 (opinion of BRICKLEY, J.). If literally applied, this language would suggest that the entrapment defense would not be available to a defendant, like Juillet, who was not previously law-abiding (by his own admission, Juillet was a frequent possessor and user of drugs), but who may not otherwise have become involved with a higher level of criminal behavior, such as drug dealing. But the entrapment test cannot properly be so limited. As I discuss in part II(A), I fully agree with Justice BRICKLEY's ultimate conclusion that Juillet was entrapped largely because the police conduct at issue posed an objective likelihood of causing the average hypothetical drug user to escalate his activities to drug dealing, when that would probably not otherwise have occurred. See BRICKLEY, J., *ante,* p 68.

I do not think, however, that this conclusion requires consideration of the defendant's individ-

---

[2] After all, while the police should most certainly be charged with the duty of avoiding reprehensible conduct objectively amounting to entrapment, the police cannot fairly be charged with the duty of psychologically evaluating every potential target of an otherwise valid sting operation to determine if the target is, at the outset, especially vulnerable to criminal enticement.

ual circumstances. Rather, all it requires is that the court focus more narrowly on the specific criminal activity or level of activity for which the defendant is charged, and ask whether the police conduct posed an objective risk of causing a hypothetical person who had not yet reached that level of criminal activity (even if he was not a spotlessly law-abiding person) to do so. This aspect of entrapment analysis was noted eighteen years ago by Justice WILLIAMS in *Turner:* "In my opinion it would be well to construe the phrase 'person otherwise innocent' more narrowly to refer to a person otherwise innocent of the specific type of crime charged." 390 Mich 25 (WILLIAMS, J., concurring in reversal).[3]

### B. THE REPREHENSIBLE-CONDUCT PRONG

I agree with Justice BRICKLEY that the causation prong of the objective entrapment test—asking whether the police conduct, objectively speaking, is of the kind that would generally cause an average, hypothetical person to engage in criminal activity that such a person would not otherwise have engaged in—is, properly understood as I have

---

[3] Contrary to Justice BOYLE's assertion, the consideration of whether the government conduct would cause the average hypothetical drug user to escalate his criminal activity does not "radically alter the test for entrapment." BOYLE, J., *post,* p 88. The escalation component of the causation prong is not a new variation of the objective test, but was first suggested eighteen years ago by Justice WILLIAMS in *Turner,* and is reaffirmed today by the author of the lead opinion in *Jamieson.* See BRICKLEY, J., *ante,* pp 67-68. Police conduct which is *objectively* of such a nature that it poses a general likelihood of causing the average drug user to escalate his criminality to drug dealing, *regardless of whether the particular defendant was so predisposed,* is police conduct which is too reprehensible for a civilized criminal justice system to tolerate. Concededly, many drug users may be prime candidates to undergo such "escalation" on their own. Some will, some will not. But the whole point of the objective entrapment test is that human nature is weak enough at best without active police encouragement of a character designed to overcome the inhibitions even of those who may *not* be predisposed to such escalation.

discussed above, an important element of entrapment analysis. Many entrapment cases may appropriately be resolved by applying only the causation prong. That is, if the court finds that entrapment has occurred under that prong, there would be no need to carry the inquiry any further. For example, as I discuss in part II(A), *Juillet* may be resolved solely under that prong, as Justice BRICKLEY himself concludes.

As I noted at the outset, however, I do not believe a purely mechanistic causation approach captures the full meaning of illegal entrapment. "[T]he reprehensibility of police conduct" cannot be defined solely "by reference to the personality traits of a hypothetical law-abiding citizen." *Jamieson,* 436 Mich 95 (CAVANAGH, J., concurring). Rather, the fundamental principle is that " '[n]o matter what the defendant's past record and present inclinations to criminality, or the depths to which he has sunk in the estimation of society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society.' " *Russell,* 411 US 437 (Douglas, J., joined by Brennan, J., dissenting), quoting *Sherman,* 356 US 382-383 (Frankfurter, J., joined by Douglas, Harlan, and Brennan, JJ., concurring in the result). Justice Douglas properly defined such intolerable conduct by noting that "[law enforcement] agents play a debased role when they become the instigators of the crime, or partners in its commission, or the creative brain behind the illegal scheme." *Russell,* 411 US 439.

I concluded in *Jamieson* that "affording a person an opportunity to commit an offense does not ordinarily constitute entrapment *unless* (1) the circumstances indicate that such an opportunity would not normally be presented *or* (2) the mere furnishing of the opportunity requires the police to

commit certain criminal, dangerous, or immoral acts." 436 Mich 95-96 (emphasis in original). The first prong of this test largely corresponds to the causation prong at the heart of Justice Brickley's analysis. The second prong reflects what I believe to be the broader "reprehensible conduct" prong of the objective entrapment test. Thus, there may well be cases in which, even though entrapment may not be established under a strictly causation-oriented approach, I might still conclude that illegal entrapment has occurred.

## II. APPLICATION TO *JUILLET* AND *BROWN*

The two cases at issue here illustrate two different directions in which reprehensible police conduct may tend: (1) excessively zealous, extreme, immoral, and shocking tactics directed toward inducing a specifically selected target into criminal activity, and (2) excessively unsupervised and uncontrolled tactics directed toward randomly "testing the virtue" of a wide range of targets. Either kind of conduct, if carried to the reprehensible extremes evident in these two cases, amounts, in my view, to illegal entrapment.

### A. *JUILLET*

I agree with Justice Brickley that defendant Juillet was entrapped, even if one applies only the causation prong. I also agree generally with Justice Brickley's reasons for so concluding, except to the extent Justice Brickley considers Juillet's individual characteristics. See *ante,* pp 65-69. The police informant's conduct toward Juillet posed a general objective likelihood of causing an average, hypothetical drug user to escalate his criminal activity to drug dealing, where such escalation would probably not otherwise have taken place.

The police informant's conduct plainly violated the reprehensible-conduct prong of my analysis as well. This case presents an appalling illustration of a sting operation which spiralled completely out of control. The facts, as thoroughly stated by my Brother BRICKLEY, and as summarized by the Court of Appeals in *People v Crawford,* 143 Mich App 348, 354; 372 NW2d 550 (1985) (a case arising from the same Cheboygan County operation), reveal that the informant, Ronald Bleser, went far beyond simply infiltrating the local "drug subculture" to ensnare preëxisting drug dealers. Rather, it appears that Bleser enthusiastically offered alcohol and illegal drugs to virtually every teenager and young adult he met in Cheboygan, and generated an entirely new center for the drug culture surrounding himself.[4] Allegations of improper conduct had been brought against Bleser in connection with earlier sting operations, which should have forewarned the police against employing him in the Cheboygan County operation. As Justice BRICKLEY notes, see *ante,* pp 47-48, the police undertook little or no meaningful supervision of Bleser's activities in Cheboygan County. Bleser was completely free to randomly select the targets for the sting.

---

[4] As the Court stated in *Crawford:*

[T]here is significant evidence in this record which would support criminal charges against the undercover agent, including evidence that the agent used and distributed drugs on a substantial scale, furnished liquor to minors, educated suspected dealers in more sophisticated techniques, and persuaded suspects to try new and arguably more dangerous drugs. [*Id.*]

A sixteen-year-old boy who was not charged in the case testified that Bleser sold him a quarter pound of marijuana on one occasion, and shared marijuana with him on numerous other occasions. A sixteen-year-old girl (whom Bleser admitted "dating") testified that Bleser carried on a sexual relationship with her. It appears that Bleser, while in the employ of the taxpayers of Michigan, went about debauching the youth of Cheboygan in more ways than one.

The lessons of this case are clear. The police either must dispense with using unstable and disreputable individuals like Bleser as undercover informants, or they must subject such informants to far closer and more effective supervision and control. The people of this state deserve, and the law demands, no less. *Jamieson* also raised an issue regarding an informant who was given random, unsupervised authority to select the targets of the sting operation, "a factor," I stated, "that would weigh in favor of a finding of entrapment under our objective test." 436 Mich 97. I reluctantly concluded in *Jamieson* that "the unsupervised activity of the informant does not present dangers that make the police action at issue here 'reprehensible,' " but only because "[t]he actions of the informant . . . occurred in a jail setting where the police have the ability to closely monitor the situation to guard against dangers as they develop." *Id.*[5]

I noted in *Jamieson* that "[a] plan to have undercover police agents pose as drug dealers and offer to sell drugs to individuals randomly chosen on the street would raise a much more serious entrapment problem," and I expressed concern about a hypothetical "government undercover investigation designed to 'test the virtue' of its citizens, absent a reasonable suspicion of ongoing criminality in the local area . . . ." *Id.* at 96, n 1. Even assuming that the police in this case had adequate grounds to believe that an ongoing drug subculture existed in Cheboygan County, the outrageous, immoral, and apparently criminal conduct of Bleser, and the lack of meaningful supervision, place this operation well outside the permissible bounds.

---

[5] See also *id.* at 97-98 (LEVIN, J., concurring) (noting that the special need "to root out venality in a prison setting" might justify "methods that would be unacceptable in other settings").

### B. *BROWN*

I can understand my Brother BRICKLEY's reluctance to find entrapment in this case under the exclusively causation-oriented focus of his analysis. It may be plausibly argued that defendant Brown might have continued to carry on his unsavory relationship with the female informant—including the criminal delivery of drugs—even if the law enforcement agents had not deliberately rekindled their relationship. But this, in my view, simply underscores the inadequacy of a purely mechanistic focus on causation. Indeed, by attempting to fine-tune his causation analysis to such a particularized degree, I believe Justice BRICKLEY inadvertently comes close to revitalizing the subjective test's predisposition focus, albeit in a different guise. The fact that Brown was known to have engaged in previous criminal conduct of the same nature, and *might* have continued to do so, does not change the fact that the agents deliberately went to outrageous lengths to induce and orchestrate his continued involvement in crime. These agents played the very kind of "debased role" criticized by Justice Douglas in *Russell,* 411 US 439.

The shocking and immoral lengths to which the agents were willing to go in this case in their zeal to entrap Brown is illustrated by the fact that they permitted, indeed encouraged, the informant—a prostitute and drug addict—to reënter Brown's apartment with a syringe to use in injecting herself with cocaine, even as these same agents went through the motions of enrolling the informant in a drug rehabilitation program. The agents' testimony that they encouraged the informant to avoid engaging in sex with Brown or using drugs rings hollow indeed in view of the obvious, singleminded

purpose behind the sting operation. It was expected, and indeed required, that the informant engage in sex with Brown and use illegal drugs, for the sting to "succeed." The agents well knew that the informant was hardly in a position to refuse to participate in this repugnant scheme, in view of the vulnerability of her situation and the inducements offered to her in return for her coöperation, which included a place to live, food to eat, spending money, transportation to see her children, and an opportunity to get treatment for her drug addiction.

I am unpersuaded by the somewhat ingenious argument, pressed by counsel for the people, that Brown's claim must fail because much of the investigators' offensive conduct was directed toward the informant rather than the defendant. See BRICKLEY, J., *ante,* pp 61-62 (apparently endorsing this argument, by suggesting that such "troubling and offensive . . . misuse of a citizen," while causing "distaste," is not relevant to the legal analysis). The evils against which the entrapment doctrine is directed cannot be so narrowly defined. As I stated in *Jamieson,* a manufactured opportunity to commit crime may constitute entrapment if "the mere furnishing of the opportunity requires the police to commit certain criminal, dangerous, or immoral acts." 436 Mich 95-96. That such immoral actions may not be directed entirely toward the defendant is not dispositive.

I agree with much of Justice BOYLE's discussion of *Brown.* In particular, I agree that the trial court and the Court of Appeals misapplied the objective entrapment test and failed to properly analyze the objectively reprehensible conduct of the government agents, especially toward the female informant. See *post,* pp 100-104. I disagree, however, with her conclusion that *Brown* should be re-

manded for "further hearing and findings." *Id.,* p
101. My colleague does not explain why Brown
would want to testify or introduce any new evi-
dence on remand when, as she herself notes,
"Brown sought to have the trial court consider the
significance of evidence regarding government mis-
conduct *without consideration of his individual
circumstances." Id.* (emphasis added). Brown
sought to have the lower courts correctly apply the
objective entrapment test, which, as Justice BOYLE
notes, they failed to do. Justice BOYLE has thus
identified an ordinary form of legal error correcta-
ble in the appellate courts. That legal error, as
Justice BOYLE herself has suggested, consists in the
lower courts' failure to properly analyze the evi-
dence which Brown has *already* presented. Neither
Brown nor any other party to this case has sug-
gested any need to adduce "further . . . findings,"
as Justice BOYLE, sua sponte, suggests.

Having noted the legal and analytical errors
committed by the courts below on the record al-
ready established, I would reverse Brown's convic-
tion and bar further prosecution on these charges
on grounds of illegal entrapment. Because the
justices signing this opinion do not constitute a
majority, however, I reluctantly concur in the
result reached by Justice BOYLE, insofar as she
would reverse the erroneous analysis of the lower
courts and remand for a new entrapment hearing
at which the trial court will have an opportunity
to apply the correct analysis and reach the correct
result. I would be surprised if Brown were to seek to
introduce any "further" evidence at such a hearing,
because I do not see how the trial court, faithfully
applying the analysis of the objective entrapment
test as set forth in this opinion, and in Justice
BOYLE's opinion with regard to her "government-
misconduct" prong, could do other than

reach the result which I would prefer to reach today.

### III. THE LEGAL BASIS OF THE ENTRAPMENT DOCTRINE

I advert briefly to an issue infrequently addressed by this or other courts: the precise legal authority upon which courts have enforced the defense of entrapment. The subjective entrapment test currently favored by the United States Supreme Court is nominally based upon implied federal statutory law. See *Russell,* 411 US 432-435. That theory, however, has been one of the aspects of the subjective test which has been most severely criticized as "sheer fiction" by those jurists who have favored the objective test. See, e.g., *Sherman,* 356 US 379-380 (Frankfurter, J., joined by Douglas, Harlan, and Brennan, JJ., concurring in the result).

Justice Frankfurter asserted that the objective test is properly rooted in a form of judicially developed common law based upon the courts' "supervisory jurisdiction over the administration of criminal justice." *Id.* at 381. While this Court did not address the legal basis for the entrapment doctrine in *Turner, supra,* Justice BRICKLEY suggested a similarly nonconstitutional basis for the doctrine in *Jamieson,* 436 Mich 79, n 7, where he stated that "the objective entrapment standard . . . has as its purpose the evaluation and discouragement of police procedures and conduct that are not necessarily invalid or unconstitutional . . . ." This perceived lack of any constitutional basis for the entrapment doctrine appears to be a primary factor in Justice GRIFFIN's view that the doctrine should be abandoned altogether. See *id.* at 98-99.

Agreeing with Justice Frankfurter's view that the "implied statutory law" theory of the subjec-

tive test is "sheer fiction," I tend to be equally troubled by the notion of this Court enforcing an implied common-law theory based upon inherent judicial supervisory power. Apart from the issue of the legitimacy of this Court's authority to promulgate such a doctrine, this theory carries the troubling suggestion that the Legislature might at any time, by statute, abolish the entrapment defense.

In my view, the entrapment doctrine is necessarily rooted in the concept of fundamental procedural fairness inherent in the Due Process Clause. The United States Supreme Court has, of course, suggested a constitutional due process standard applicable to reprehensible police conduct. See *Russell*, 411 US 430-432; see also *Hampton v United States*, 425 US 484, 491-495; 96 S Ct 1646; 48 L Ed 2d 113 (1976) (Powell, J., joined by Blackmun, J., concurring in the judgment). That standard has thus far been defined, however, in such vague, amorphous, "shock-the-conscience" terms as to be quite meaningless, and it clearly falls well short of embracing the full scope of even the flawed subjective entrapment test.

I disagree with the limited reading thus far given to the concept of due process by the United States Supreme Court in this area, and I would find that the entrapment doctrine, as applied in this state through the prevailing objective test, is properly rooted in the Due Process Clause of the Michigan Constitution. See Const 1963, art 1, § 17.[6]

### IV. CONCLUSION

For the foregoing reasons, I concur with Justice

---

[6] Justice BOYLE opines that my discussion in this section constitutes "unnecessary dicta." *Post*, p 109, n 30. It is odd indeed, in my view, to suggest that an articulation of the underlying legal basis of the dispositive analysis applied by a court or judge to decide a case constitutes "unnecessary dicta."

BRICKLEY that Juillet was entrapped and that his conviction must be reversed. I concur with Justice BOYLE that the trial court and the Court of Appeals rejected Brown's entrapment claim by applying an incorrect legal analysis, and that the judgment of the Court of Appeals in *Brown* must therefore be reversed. I also concur, though reluctantly, in Justice BOYLE's conclusion that *Brown* should be remanded for a new entrapment hearing, at which the trial court will have an opportunity to apply the correct analysis and reach the correct result.

LEVIN and MALLETT, JJ., concurred with CAVANAGH, C.J.

BOYLE, J. (*concurring in part and dissenting in part*). When the immediate interest generated in the wake of these opinions has long since waned, investigators, lawyers, and judges will be analyzing the definition and application of the entrapment defense announced today in order to reach a coherent view of entrapment fully endorsed by a majority of the justices of this Court. I therefore write separately to summarize the force of the opinions taken together and to set forth my position regarding the appropriate approach to the entrapment issue and the reasons for remanding these cases to the trial court.

Initially, it is clear that neither Brown nor Juillet could be found to be entrapped under the objective test. Whether one asks whether a law-abiding person would have given drugs for sex, or whether that person would have provided drugs to third parties because a friend gave him free beer and marijuana, the answer is clearly, "no."

Second, it is clear that all seven justices favor a new test for entrapment. The objective test for

entrapment asks whether the police engaged in misconduct of a type that would induce a normally law-abiding person to commit the crime in question. *Sorrells v United States,* 287 US 435, 459; 53 S Ct 210; 77 L Ed 413 (1932) (Roberts, J., concurring). Under this test, the circumstances of the defendant are irrelevant. Because Justice BRICKLEY's test considers the circumstances of the actual defendant, and Chief Justice CAVANAGH considers the circumstances of the hypothetical defendant (the average drug user), both endorse new tests for entrapment not encompassed in the objective test. Moreover, protestations that the test remains "objective" cannot obscure the fact that neither the prosecution nor the defendants have been given the opportunity to develop a record that anticipates this shift in analysis.

Third, I agree with the force of Justice BRICKLEY's opinion in *People v Jamieson,* 436 Mich 61; 461 NW2d 884 (1990), and with Justice GRIFFIN's partial concurrence and partial dissent that would adopt a subjective test for instigation entrapment. *Id.,* p 98.

Fourth, Chief Justice CAVANAGH and I would recognize, to different degrees, a reprehensible-conduct test for entrapment. Finally, in lieu of the Court's reconsideration of its adherence to the so-called objective test for entrapment and its adoption of the purely subjective test, I would align myself with the version of the entrapment defense set forth today by Justice BRICKLEY.

I

A

Justice BRICKLEY alters the objective test for entrapment by contorting the test so that the trial court may indulge in inferences of susceptibility

from circumstances of the defendant, such as age, limited education, and dependency. *Ante,* p 67. The flaw in the approach is immediately apparent when the test, as applied, produces inconsistent results. Although it is objectively more reprehensible to use an addicted prostitute to obtain drugs from a targeted defendant than it is to set up an informant who supplies marijuana to members of a local drug culture, Brown loses and Juillet wins. Since the only distinction between them offered by Justice BRICKLEY is that the government "instigat-[ed the] relationship," in *Juillet, ante,* p 65, but "only allowed an already existing course of conduct to continue" in *Brown, ante,* p 64, his result clearly turns on the fact that Brown was ready and willing, that is, predisposed to commit the crime. Justice BRICKLEY's objective/subjective test nonetheless bars the trial court from considering all relevant evidence, including predisposition,[1] that bears on the actual transaction between the police and the defendant and produces results that are neither reliable nor internally consistent.

Chief Justice CAVANAGH's test would even more radically alter the test for entrapment. While barring consideration of the defendant's individual circumstances and of predisposition, the Chief Justice proposes that we inquire whether the police conduct, objectively speaking, is of a kind that would have caused the average hypothetical drug user to escalate his criminality. He acknowledges that many drug users may escalate on their own; "Some will, some will not," *ante,* p 76, n 3. Notwithstanding that the logical force of this observation is to inquire who "will," or who "will not,"

---

[1] By contrast, I read *Jamieson* as permitting consideration of all the circumstances surrounding the transaction and as rejecting the prosecution's argument that the entrapment issue should be a jury question.

Chief Justice CAVANAGH would force trial judges to assume a defendant who "will not." Otherwise stated, at the cost of immunizing the criminal conduct of all those who would escalate, the trial court must assume a circumstance regarding the defendant, in this case, that is, that all drug users, casual, regular, or inveterate, would not escalate. Chief Justice CAVANAGH's test would thus skew the reliability of the entrapment decision by precluding access to any relevant facts regarding the defendant's role in the transaction.

For the reasons set forth in I(B), I would abandon the objective causation test in favor of the subjective test that permits consideration of all facts and circumstances bearing on whether the government "caused" the conduct in question.

I also would align myself with those justices of the United States Supreme Court and federal and state courts that recognize an objective-misconduct prong of the entrapment defense that bars prosecution in those rare cases in which the government's conduct is truly reprehensible.

While I do not agree that the entrapment defense should be eliminated, I agree in principle with Justice GRIFFIN's suggestion that we should "at least move" to the subjective test. *Jamieson, supra,* p 98. The Chief Justice's far-ranging analysis will broadly immunize criminal conduct that, in reality, is attributable to the defendants. Justice BRICKLEY's analysis, though flawed, is the least objectionable of the views that apparently each command three votes. Thus, to provide guidance on the issue, and in lieu of the Court's adoption of a subjective test for entrapment, I reluctantly align myself with Justice BRICKLEY's subjective/objective test for the causation prong of the test.

My colleagues' contrary contentions notwithstanding, in my view, neither case can be fairly

reversed or affirmed as a matter of law. Although both opinions profess a logical extension of previous law, in truth each adopts a version of the "objective" test previously unknown in our jurisprudence. Chief Justice CAVANAGH does not acknowledge that, under Justice BRICKLEY's test, both the prosecution and the defendants might now produce evidence that would have been irrelevant under a purely objective test. Justice BRICKLEY does not acknowledge that Brown's decision not to offer evidence, as well as the prosecution's failure to introduce evidence (such as the record of the conversations), would have been influenced by the fact that evidence of vulnerability or evidence rebutting the inference of vulnerability was inadmissible under the objective test for entrapment.

Similarly, both opinions state that whatever error was committed below, was error of law in analyzing the evidence of record, correctable in the appellate courts. What each fails to recognize is that, if there was "error in law," it was error under the newly formulated tests, that a trial judge has not passed on the credibility of evidence offered under these tests and the defendants, and the prosecution, have not been afforded the opportunity to produce evidence for the record relevant thereto or to argue their application to the testimony offered.

In short, because the opinions of the Court today create new tests for entrapment, long after the defendants and the government created records based on the objective test, I would hold that the government and the parties in both cases are entitled to a remand, at which time any party may provide evidence relevant to whether the government's activities would have induced "a normally law-abiding citizen, in [the defendant's] circumstances, to commit the crimes with which he was

charged," *ante,* p 41, and, additionally in *Brown,* whether the police conduct was reprehensible in that they manufactured the criminal conduct.

**B**

Michigan courts have never deviated from articulating a rationale for entrapment founded upon a belief that the doctrine precludes punishment where the government has engaged in conduct that unfairly entices a defendant to commit a criminal act only to prosecute him. We have refused to punish a criminal defendant because "it would seem to be the duty of [an officer of the law] to take such steps as would be likely to prevent the commission of the offense, and tend to the elevation and improvement of the would-be criminal, rather than to his farther debasement." *Saunders v People,* 38 Mich 218, 222 (1878) (MARSTON, J., concurring). The government loses its right to punish when its agents have acted in an extremely reprehensible way.

At the same time, this Court recognizes the necessity for undercover police work and sting tactics to combat virtually undetectable crimes. Thus, the Court has not attempted to decide whether better or more effective investigative techniques might have been used and has avoided a bright-line approach, which can function as authorization per se of all investigative techniques within the bright line as well as immunization of criminal conduct outside the bright line.[2] Devising

[2] A formulation limiting the probative force of the defendant's circumstances to his weaknesses might invite the innovative defendant to employ runners who are young and have "limited education," *ante,* p 67, a result which Justice Matthews of the Alaska Supreme Court illustrated as permitting "drug sellers to insulate themselves from conviction by the device of requiring all their customers to grovel briefly before a sale is made." *Pascu v State,* 577 P2d 1064, 1069 (Alas, 1978) (Matthews, J., concurring).

a specific test that will preclude punishment where government misconduct unfairly manufactures or creates crime without preventing essential law enforcement activity may not be possible.[3] However, I do not agree with Justice GRIFFIN that the courts should abandon the long-asserted authority to restrain abusive investigative conduct. The rhetoric suggesting eradication of constitutional rights as the cost of the war on drugs may, at times, be overblown. That fact should not lead to complacency regarding the lengths to which police frustration and even good intentions may carry a given investigation.

I am persuaded that we should abandon the objective entrapment test of instigation. The conclusion derives some urgency from the inadequacy of the test put forth by Justice BRICKLEY for an "objective test" that focuses on the particular circumstances and vulnerability of the defendant, while barring evidence of predisposition and producing inconsistent results as applied in the instant cases. Likewise, while Chief Justice CAVANAGH's test would postulate "the average hypothetical drug user," a formulation that ostensibly comports with the objective approach, to state the

[3] Judicial line drawing is a task which the courts often encounter, but, in examining the interplay between criminal conduct and government investigatory action, the search for general principles to guide the court is especially difficult. Professor Kent Greenawalt observed that when confronted with serious moral choices "we test our intuitive reactions to particular situations against our accepted principles" until both may give, and "we arrive at what John Rawls calls a 'reflective equilibrium,' in which our sense of right for particular issues matches our principles." Greenawalt, *The enduring significance of neutral principles,* 78 Colum L R 982, 997 (1978). It is that process which has sometimes caused this Court difficulty in the past and in which we are engaged in these cases. Nevertheless, the common law is built upon the gradual development of precedent as courts mesh guiding principles with shifting fact patterns which arise as circumstances change. Given the Court's duty to prevent prosecutions on the basis of reprehensible police conduct, it is necessary to examine each new set of facts in light of principles articulated by this Court.

postulate is to expose its fatal flaw. To be sure, there may be situations in which it is possible to answer the inquiry regarding whether the government's conduct "instigate[d] the commission of a crime by one not ready and willing to commit it," Stewart, J., dissenting, *United States v Russell,* 411 US 423, 445; 93 S Ct 1637; 36 L Ed 2d 366 (1973), but the hypothetical casual drug user assumption will not yield a reliable answer regarding whether government conduct caused the average drug user to escalate his criminality "where such escalation would probably not otherwise have taken place." *Ante,* p 78. In point of reality, we know nothing regarding whether a defendant was a casual drug user, a regular drug user, or an inveterate abuser. The irreducible reality is that, no matter how it is labeled, an instigation test examines the defendant's characteristics. The inquiry is subjective and necessarily so. The question is whether the defendant would have done the act without government encouragement. Thus, most importantly, I would adopt the subjective test for instigation because failure to define entrapment by reference to both subjective and objective factors, distorts any meaningful evaluation of the reality of what caused the transaction between government and accused.

However, because government conduct may be reprehensible, not only because it manufactures crime, but on the basis of the level of misconduct alone,[4] I would embrace a dual view of "entrapment" that would bar prosecution because of truly

[4] In observing that there may be circumstances in which conduct not directed at a predisposed defendant might bar the government from invoking the judicial process, Judge Henry Friendly observed, "there is certainly a limit to allowing governmental involvement in crime. It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict . . . . '[I]nvestigation' involving participation in activities that result[s] in injury to the rights of its citizens is a course that

reprehensible police conduct and would bar prosecution for conduct that instigates or manufactures crime. Government misconduct would be evaluated by focusing on police conduct. Government instigation would be evaluated subjectively by taking into account the defendant's circumstances and the interaction between the government agent and the defendant, and the trial court would determine both issues as a matter of law. Such an approach will accommodate the necessity to protect against overzealous law enforcement that is the heart of the objective approach, *Sherman v United States,* 356 US 369, 381; 78 S Ct 819; 2 L Ed 2d 848 (1958) (Frankfurter, J., concurring in the result), while preserving the opportunity for the defendants who claim that, although the police conduct was not intolerable in the objective sense, it was intolerable in light of the particular circumstances.

The objective misconduct defense is justified when the government engages in illegal behavior, the government conduct invades personal privacy, the government unfairly manufactures antisocial activity, or "because [entrapping behavior] places in the hands of the executive the power to make criminals." Seidman, *The Supreme Court, entrapment, and our criminal justice dilemma,* 1981 Sup Ct R 111, 145.

Government encouragement of an individual to perform a prohibited act interferes with the functions expected of the act requirement in a rule-oriented system of criminal law. Carlson, *The act requirement and the foundations of the entrapment defense,* 73 Va L R 1011, 1056 (1987). To

courts should be extremely reluctant to sanction." *United States v Archer,* 486 F2d 670, 676-677 (CA 2, 1973). It is similarly unthinkable that any one of us would opine that Brown's conviction could stand had the government tortured or threatened an unwilling Roberts to gain evidence against him.

merit punishment, criminal conduct requires both an actus reus, a voluntary act or omission which causes social harm, and a mens rea, the mental state provided in the definition of the offense. See, generally, Dressler, Understanding Criminal Law, pp 63-115. The act requirement embodies critical limitations on the imposition of criminal sanctions. It guarantees that the accused has done something to merit punishment,[5] preserves the sphere of personal autonomy in which an individual can think and act without fear of government intrusions,[6] and prevents arbitrary and abusive exercise of government power in the criminal law arena.[7] Carlson, *supra,* pp 1053-1056. Because the use of government encouragement thwarts these protections of the act requirement, the entrapment defense prevents criminal prosecutions when government authority has been undermined by reprehensible government conduct.

[5] Whether adhering to a retributive or utilitarian justification for punishment, the act requirement ensures that punishment is justifiable because of the social harm committed by performing the act itself or the social harm resulting from a violation of the social contract or as an indicator of the potential dangerousness of the criminal actor. See Carlson, *supra,* pp 1059-1082. It has been suggested that cases like that involving John De Lorean in which the jury found entrapment, despite evidence of predisposition, rest on the factfinder's sense that the moral authority of government to punish has been undermined by the methods employed. Comment, *Entrapment, De Lorean and the undercover operation: A constitutional connection,* 18 J Marshall L R 365 (1985).

[6] Government employs its power to intrude into an individual's decision making rather than maintaining a "neutral position vis-à-vis its citizens and the choices that they make." Carlson, *supra,* p 1086. This forces the individual to expend time and energy on "unsolicited and probably unwanted enticement to crime, and he is forced to make a choice that he otherwise might never have faced." *Id.,* p 1085.

[7] Generally speaking, the government is precluded from imposing criminal sanctions until there has been an actus reus. The act requirement limits the government to punishing conduct which causes some social harm, "provides a reasonably objective basis for assessing who should be punished, and hinders the government's ability to target its enemies or protect its friends when it uses the criminal sanction." Carlson, *supra,* p 1089.

The subjective component of the entrapment defense recognizes that trial courts cannot realistically determine whether the governmental activity in question has manufactured the crime without considering the circumstances surrounding the transaction.

As *Jamieson* explicitly recognized, a judge cannot reliably answer the question regarding whether the conduct in question was caused by the police by postulating only a defendant's vulnerability or the hypothetical defendant. The normally law-abiding or average person probably cannot be induced or tempted into criminal conduct absent duress or coercion.[8]

An objective formulation of the causation prong may be unreliably underinclusive because it eliminates susceptible persons who succumb to weaker pressure or inducements than the normal hypothetical person. Yet, an inducement which seems "fair in the abstract may be unfair in a particular case, for reasons that are unknown to the agent and therefore do not affect the propriety of his conduct." Park, *The entrapment controversy,* 60 Minn L R 163, 220 (1976). Likewise, the test may be unreliably overinclusive because it requires a trial court to determine the instigation question

---

[8] *Pascu v State,* n 2 *supra,* p 1067 (replacing the *Grossman v State,* 457 P2d 226 [Alas, 1969] average-person standard with a focus on the particular conduct of police in the case presented); *State v Cripps,* 692 P2d 747, 749-750 (Utah, 1984) ("an average person or ordinary citizen is not a former drug addict, will not be begged by a former lover to obtain drugs, does not have any notion of how to reach people who sell drugs, would probably not befriend the sort of stranger who turns out to be an undercover narcotics agent, and could not imagine circumstances short of physical threats that would prompt him to obtain marijuana to sell"). Note, People v Barraza: *California's latest attempt to accommodate an objective theory of entrapment,* 68 Cal L R 746, 757 (1980) (characterizing the explanation of entrapment on the basis of normally law-abiding persons as circular and concluding that it is questionable whether the standard can be applied without "emasculating the entrapment defense").

without considering probative evidence bearing on
the issue.[9] This Court's historical concern with
misconduct is addressed by recognition of a varia-
tion of the due process defense that will bar pros-
ecution when the government has engaged in truly
reprehensible conduct.[10] This approach will pre-
serve the Court's historic authority to curb abusive
police conduct while permitting a realistic exami-
nation of the question regarding whether govern-
ment has instigated the criminal conduct. *Saun-
ders, supra,* p 222.

Under an objective-misconduct prong, the trial
court focuses on the government conduct. Govern-
ment inducements should not make the crime
unusually attractive nor, as *Jamieson* explained,
should "discretionary investigative enforcement
measures extend beyond a tolerable level when *by
design* the government uses continued pressure,
appeals to friendship or sympathy, threats of ar-
rest, an informant's vulnerability, sexual favors, or
procedures which escalate criminal culpability."
*Jamieson, supra,* p 89. (Emphasis in the original.)
The inquiry is whether the government's conduct

[9] For example, if the government targets a political foe, the conduct
may warrant an entrapment finding, but resolution of the question
necessarily requires examination of both the government conduct and
the characteristics of and government interaction with the individual
defendant. Likewise, judges may intuitively suspect that some of
those defendants charged with major drug offenses may have reached
the amount that triggers mandatory minimum sentences because the
amount, rather than the criminal intent of the defendant, was the
target of the investigation, another inquiry which involves a factual
evaluation of the characteristics of the defendant and the interaction
between the defendant and the government.

[10] Five justices comprising the concurring and dissenting opinions
in *Hampton v United States,* 425 US 484; 96 S Ct 1646; 48 L Ed 2d
113 (1976), expressly recognized the viability of a due process defense
in cases involving outrageous government conduct. As developed in
the lower federal courts, the defense is generally available to a
defendant admittedly predisposed to commit the crime and raises a
question of law for the court. *United States v Twigg,* 588 F2d 373 (CA
3, 1978); Klar, *The need for a dual approach to entrapment,* 59 Wash
U L Q 199 (1981).

falls below an acceptable standard for the fair and honorable administration of justice.

The subjective analysis inquires into whether the law enforcement conduct instigated or created the crime, an inquiry which involves an analysis of all evidence bearing on the question, including predisposition.[11] Because the causation question cannot be answered without reference to the defendant on trial, this inquiry has been, in fact, part of the objective test. *Sherman, supra,* p 384 (Frankfurter, J., dissenting).[12] See also *People v Turner,* 390 Mich 7, 23; 210 NW2d 336 (1973).

Since the government-instigation or -causation prong considers whether a given act accurately gauges the threat that the defendant poses to society absent police encouragement, see Carlson, *supra,* p 1093, n 254, the court must examine the transactions leading up to the offense, the inter-

[11] One who raises the instigation defense should not be regarded as implicitly arguing that the criminal conduct, rather than being a free and deliberate act, was caused by the inducements of the police. Such an analysis is contrary to basic assumptions of criminal law concerning the free will of the defendant and confuses causal statements based on the idea of instrumentality with causal judgments meant to reflect understanding of the motivation of the individual. See comment, *Causation and intention in the entrapment defense,* 28 UCLA L R 892-894 (1981). The type of inducements ordinarily at issue when entrapment is raised does not involve the use of an individual as an instrumentality, that is, without his exercise of will or voluntary action. Normally, the government provides inducements which tempt or persuade the defendant to engage in the complained-of conduct but the defendant remains free to act or not. When persons are used as an instrumentality of another, they are normally excused from responsibility for their actions. On the other hand, the law does not normally excuse an actor simply because it understands the forces that motivated him to engage in the proscribed conduct. To hold otherwise could result in a universal excuse. Dressler, *Reflections on excusing wrongdoers: Moral theory, new excuses and the modern penal code,* 19 Rutgers L J 671, 687 (1988).

[12] See also *Hampton v United States,* n 10 *supra,* p 494 (Powell, J., concurring) (under the objective test of the due process approach, differences between the circumstances would be irrelevant despite outrageous government conduct relative to the circumstances, and although predisposition could be proved against persons of widely varying degrees of criminality).

action between the agent and the defendant, the
type and size of inducements, the nature of the
criminal conduct at issue, the extent to which the
investigation targets a particular individual, and
the extent to which procedures used escalated
criminal culpability of the defendant. The defen-
dant's predisposition is a relevant factor under
this prong since it bears upon whether he would
have posed a threat to society independent of
government inducements.[13] It is not dispositive, but
the instigation issue cannot be accurately evalu-
ated[14] if weaknesses must be assumed, if prior
unrelated criminal activity must be disregarded,
and if motive to commit present activity may not
be inferred from past similar activity.[15] Just as
improper police conduct weakens the authority of

[13] Focusing exclusively on the defendant's predisposition is unlikely
to yield a correct result in some cases. Normally, the criminal act
limits punishment in an anticipatory liability situation (such as
attempt or conspiracy) to circumstances where the act serves the
evidentiary function of corroborating the actor's criminal purpose.
Carlson, *supra,* pp 1080-1081. When the government has intervened to
entice criminal conduct, the evidentiary function of the act require-
ment has been weakened. If the enticement was unusual or calculated
to induce a motive besides ordinary criminal intent, even if the
defendant had a long criminal history, it is not always clear that the
defendant would have engaged in the conduct without government
encouragement. Therefore, even courts adhering to a subjective ap-
proach have considered the nature of the inducement and the defen-
dant's reaction to it as part of the inquiry into entrapment. See, e.g.,
*Sherman v United States, supra,* p 373.

[14] While the defendant bears the burden of proving by a preponder-
ance of the evidence that he was entrapped under the objective
standard, *People v D'Angelo,* 401 Mich 167, 180-183; 257 NW2d 655
(1977), federal and state courts applying the subjective test have
employed a variety of tests, including placing the burden of produc-
tion on the defendant and shifting the burden of persuasion to the
government. Marcus, *The entrapment defense and the procedural
issues: Burden of proof, questions of law and fact, inconsistent defen-
ses,* 22 Crim L Bull 197 (1986).

[15] The focus on predisposition has been criticized by this and other
courts for suggesting that the defendant's past record can justify
police misconduct. See *People v Sinclair,* 387 Mich 91, 116-120; 194
NW2d 878 (1972); *Saunders v People, supra; Sorrells, supra,* pp 458-
459 (Roberts, J., concurring); note, People v Barraza, n 8 *supra.*
However, while predisposition does not justify police misconduct, the

government to punish, trial court findings based on jerry-built constructs weaken the factual reliability of the trial courts' findings and, hence, public confidence in the result.

## II

These cases confront the Court with highly disparate factual scenarios. In *Brown,* the Court is presented with an apparently targeted investigation into a well-known public figure in which the government informant, a prostitute and drug addict, gained access to Brown's apartment to obtain evidence of the possession and delivery of drugs through her longstanding relationship with Brown. In *Juillet,* the Court is presented with an unfocused broad-ranging undercover investigation into drug use among young persons in Cheboygan County into which the defendant stumbled after meeting the informant on the street. In each of these cases, the defendants contend that government conduct was sufficiently reprehensible to warrant an entrapment finding.

### A. *PEOPLE v BROWN*

Having set forth the analysis of entrapment I would adopt, and having agreed that in lieu thereof I would adopt Justice BRICKLEY's objective/subjective test, I must disagree with the conclusion which would affirm the lower court findings that Brown was not entrapped. In my view, the record below supports neither Justice BRICKLEY's conclusion that Brown was not entrapped, nor Chief

government-instigation or -causation entrapment defense posits that the defendant would not have committed the crime without the illegal conduct of the police. The question for the court is, would he? —a question that cannot be answered without a full examination of the defendant and his circumstances.

Justice CAVANAGH's conclusion that the government escalated the criminal activity or engaged in reprehensible conduct. I would reverse the decision of the Court of Appeals and remand the case for further hearing and findings regarding whether entrapment occurred under the revised standards for the entrapment.

Brown sought to have the trial court consider the significance of evidence regarding government misconduct without consideration of his individual circumstances. Both the trial court and Court of Appeals shifted focus from government misconduct to whether the government instigated the criminal act of which Brown was convicted. By analyzing the case under the government-instigation prong, despite the lack of evidence presented, the lower courts overlooked consideration of the government's mistreatment of the informant, Roberts.

The trial court stated the test for entrapment as whether the record supports "a conclusion that the police or their agent manufactured Defendant's crimes by conduct likely, when objectively considered, to induce or instigate the commission of a crime by a person not ready and willing to commit it . . . ." Yet, when applying the test to the facts of this case, the trial court focused on Brown's predisposition, that is, whether the police changed Brown's previous course of conduct. This was error under the objective test, and it is error under the lead opinion's merging of objective and subjective considerations.

Justice BRICKLEY rests affirmance of the case on the apparent conclusion that Mr. Brown was predisposed, *ante,* p 62, without consideration of the subjective vulnerability that he is willing to indulge regarding defendant Juillet. Brown is denied relief because "the solicitation was no different than the many offers made in routine purchases

and sales by police informants," *id.,* while Juillet's conviction is barred despite the fact that he committed the offense with which he was charged within hours of meeting the informant. It is true that Brown did not testify that he was addicted to drugs, *id.,* p 63. Neither did Juillet. Nor is there evidence in the entrapment hearing in *Juillet* of dependency or appeals to sympathy.[16]

Finally, Justice BRICKLEY's analysis does not explain why police encouragement that leads to an informant's decision to "resume contact with Brown," *id.,* p 64,[17] is permissible use of friendship, while use of "police-manufactured friendship" to investigate the drug subculture in *Juillet* is impermissible.[18] *Id.,* p 65.

The due process defense accepted in *United States v Russell, supra,* pp 431-432, and acknowledged in the federal courts, is broad enough to consider treatment of the informant and is distinguishable only by degree from the objective standard for entrapment. Note, *Entrapment defense in New Jersey,* 21 Rutgers L J 419, 435, n 136 (1990). On remand, the court should consider: whether the police themselves engaged in criminal con-

---

[16] Both Brown and Juillet apparently had engaged in the use of various drugs in the presence of the government agents. From the initiation of the investigation, both Brown and Juillet supplied drugs to the government agents, Roberts and Bleser, with little apparent hesitation or reluctance. Although Brown and Juillet supplied drugs to the government agents on several occasions, neither was charged with drug dealing nor can be properly characterized as drug dealers.

[17] Although the trial court apparently satisfied itself that there was no governmental misconduct or impermissible motive in targeting Brown, there is no in camera record supporting this conclusion. On remand, the trial court should examine the government's basis for targeting Brown to insure that no misconduct was involved.

[18] There is no doubt that Brown's conduct was sordid. He met Roberts as a prostitute, through another prostitute. In the course of the instant investigation, he, Roberts, and another woman used drugs in his apartment. Moreover, while the government may have exploited Roberts' addiction, so did Mr. Brown. What is sordid conduct on Mr. Brown's part, may be intolerable conduct on the part of the government.

duct;[19] whether the police made appeals to past friendships, temptation of financial gain, or repeated solicitations; and whether the police had a legitimate motive for conducting the investigation. *People v Isaacson,* 44 NY2d 511, 521; 406 NYS2d 714; 378 NE2d 78 (1978).

As Justice Powell observed in *Hampton v United States,* 425 US 484, 495, n 7; 96 S Ct 1646; 48 L Ed 2d 113 (1976), it will be the rare case in which the misconduct defense will succeed. Vigilance and increased sophistication are essential to effective law enforcement, and the litany of woe in the wake of our drug dominated culture admits of no less. However, consideration of the conduct of law enforcement toward an informant is a factor which may be evaluated in determining whether the government's conduct falls below an acceptable standard for the honorable administration of justice.[20]

The court on remand should address under the

[19] See *People v Taylor,* 599 P2d 496 (Utah, 1979) (an undercover agent, an addict who supported her habit by prostitution, had cohabited with the defendant, and resumed the relationship with him to gain evidence for charges of distributing heroin was held to have entrapped him on the basis of her close personal relationship engendering sympathy and pity for her need for drugs).

State courts have upheld convictions despite the use of intimate sexual relationships in cases in which the primary charge is prostitution and the relations are necessary to obtain evidence, but these facts are not before us here. See, e.g., *State v Tookes,* 67 Hawaii 608; 699 P2d 983 (1985) (the deceitful use of sex by civilian volunteer acting at the behest of police investigating prostitution ring was not outrageous conduct); *Anchorage v Flanagan,* 649 P2d 957 (Alas App, 1982) (use of sex by an undercover officer in the investigation of prostitution was not outrageous); *State v Putnam,* 31 Wash App 156; 639 P2d 858 (1982) (use of sex by a civilian working with police in an investigation of prostitution was permissible).

[20] This is not to say that Brown did not instigate the conduct or that the government engaged in such reprehensible conduct that the prosecution must be barred, questions that my colleagues urge me to resolve, albeit to agree with their results. It is to say that both Brown and the government (whose status as an interested party both the lead opinion and dissent overlook) are entitled to an opportunity to formulate the record under the new tests my colleagues adopt.

government-instigation or -causation prong all relevant considerations bearing on the instigation question, including, but not limited to, who initiated the sexual relationship, who first introduced drugs as a method of payment, and the extent to which, if at all, the contents of the tapes of Roberts' conversations bear on the instigation or misconduct issue.[21] The lower courts would also consider the most troubling aspect of the case under the misconduct analysis—the government's treatment of its informant, Roberts, a known prostitute, heroin addict, and user of other illicit drugs.[22] The trial court should also address whether the government agreed that Roberts could inject herself with cocaine and whether it was necessary to obtain the evidence. Under the tests adopted today, the trial court must determine whether, on the basis of all the facts and circumstances, the government instigated the defendant's conduct and whether the government's conduct manifested an exploitation of Roberts that is inconsistent with the proper use of governmental authority.[23]

### B. *PEOPLE v JUILLET*

I also disagree with the finding that the defen-

[21] While it may be difficult to hypothesize a case short of a violation of due process that would violate the misconduct prong where the defendant was predisposed to commit the crime, I would not eliminate that possibility here.

[22] To emphasize the determination that should occur on remand, I observe both my disagreement with Justice BRICKLEY's conclusion that the government's treatment of Roberts is irrelevant and the factual conclusion of the Chief Justice regarding the informant's "vulnerability." CAVANAGH, C.J., *ante*, p 82.

[23] See *People v Isaacson, supra*, pp 522-523 (an "overriding police desire for a conviction of any individual" which was obtained by police brutality and "cunning subterfuge employed to enlist the services of an informant," viewed together, "reveal a brazen and continuing pattern in disregard of fundamental rights" sufficient to preclude prosecution on due process grounds).

dant Juillet was entrapped.[24] However, although five justices of this Court are prepared to bar the prosecution on the basis of entrapment, I observe that this reversal bodes far more serious consequences for effective enforcement of the law than the result in *People v Brown.* Although symmetry requires remand of this case for further hearing and findings regarding whether entrapment occurred under the revised standard for entrapment,[25] there is on this record no evidence suggesting government conduct that was offensive in the objective sense.

In addition to the delivery of marijuana to Trooper Patrick, Juillet was charged with delivery of marijuana for his conduct in a transaction occurring on March 2, 1982. On that occasion, he met Bleser and another undercover agent and arranged a meeting with a dealer who had marijuana and LSD for sale.

Despite extensive testimony regarding the police undercover operation and Bleser's conduct, there is no evidence that the size or type of inducements used by Bleser resulted in an opportunity to commit crime that was uncommon or excessive. Nor was there unambiguous testimony that Juillet acted out of a motive, such as sympathy or fear, other than ordinary criminal intent. Although Juillet testified that he considered Bleser his

[24] I find Justice BRICKLEY's reversal of this case inconsistent with the objective person, ready and willing to commit the crime, set forth in *Jamieson,* just as this result is internally inconsistent with the conclusion that Brown was predisposed. *Ante,* p 62. As noted above, neither Juillet nor Brown were drug dealers. Moreover, to the extent that Juillet's conduct can credibly be described as simply " 'sociable' with another drug user as part of a friendship," *id.,* p 68, so was Brown's.

[25] Without prejudging the outcome, I suspect that, in the long run, the jurisprudential significance of today's decisions will not arise from an unusual situation like that in *Brown* but, rather, from the conclusion of entrapment of an individual who fell unsuspectingly and rather enthusiastically into a not atypical investigative net.

friend, the record reveals an association between the two that had begun less than a month before the transaction giving rise to this action. Juillet also remarked that Bleser frequently expressed interest in purchasing drugs for himself or in assisting friends to purchase drugs. But there is no suggestion that Bleser urged Juillet to help because of their friendship. Nor is there any testimony suggesting that Juillet thought Bleser was addicted to drugs or that he or his friends were in need of drugs to avoid withdrawal. Finally, while Justice BRICKLEY seems to believe that the defendant was convicted of being a dealer in drugs, he was not. Juillet, like Brown, was convicted of delivery of marijuana, an offense that does not require consideration . as an element. Juillet pleaded guilty to delivery of marijuana, the precise activity he engaged in on the very first day he met Bleser, and with little or no inducement. Objectively viewed, it appears that the police simply set a widespread net into which Juillet unsuspectingly fell.[26] See *Folsom v State,* 734 P2d 1015, 1017 (Alas App, 1987).

Allegations were made that Bleser repeatedly violated various laws, including those against use and delivery of drugs. The facts suggest that Juillet engaged in the delivery of marijuana on a small scale and not for profit. They do not suggest that Juillet never delivered drugs to other persons in exchange for money or goods. Apparently, Juillet sold drugs for cost rather than to make a profit, but the statute does not require a profit for a violation. MCL 333.7401(1); MSA 14.15(7401)(1). While Bleser's activities may have been unaccept-

---

[26] Bleser struck up an acquaintance with Juillet on the street and, after asking if Juillet was old enough to go to a bar, offered to purchase beer for the two of them. Juillet and Bleser went to Bleser's apartment where, after drinking some beer, at Bleser's request, Juillet supplied Bleser with two joints.

able in the overall scheme, they do not appear to have been relevant to Juillet's conduct in the specific charge.[27]

To reëmphasize my conclusion that the result in *Brown* can be neither reversal nor affirmance on the record as it stands, I observe again that Justice BRICKLEY finds that Brown was predisposed and Juillet was not. To the extent that these conclusions rest on circumstances of the defendant, these are mixed questions of fact and law that the prosecution has been given no opportunity to contest in *Juillet,* and that Brown had no opportunity to explore under the objective test. Indeed, Justice BRICKLEY's conclusion that, since there is no evidence that Juillet was a drug dealer, the only reason for his "delivery of drugs" was Bleser's incessant requests, *ante,* p 68, is classical question begging. Under the objective test, extant in 1982, Juillet's predisposition, like that of Mr. Brown, was irrelevant. Thus, whether either was a drug deliverer was irrelevant and inadmissible in the entrapment hearing. To conclude from the absence of an inadmissible fact that the government must have manufactured the crime in *Juillet* but did not manufacture the crime in *Brown* again evidences that the newly created objective/subjective test will not *yield a reliable result,* and that it will allow questionable conduct such as that in *Brown,* while prohibiting routine undercover activities such as that in *Juillet.*[28]

[27] This case is unlike *Brown,* where the government conduct vis-à-vis the informant was directly connected with obtaining the evidence for Brown's conviction.

[28] Juillet's strongest argument for an entrapment finding under the instigation prong is that the government took advantage of his drug dependency and limited intelligence to instigate crime that otherwise would not have occurred. However, this argument also lacks adequate record support. Juillet testified that he had never used LSD and had used PCP approximately twice. As the record now stands, Juillet appears only to have been a regular user of marijuana. Nor was

Because the opinions of the Court today have adopted new tests for the definition of entrapment, I would reverse the Court of Appeals and remand the case to the trial court to afford the parties the opportunity to present any additional evidence relevant to the revised standards.[29]

### III

I would reject, under the instigation test, the approach that hypothesizes a defendant without a history as well as the fantasy that creates the "average, hypothetical drug user." CAVANAGH, C.J., *ante,* p 78. The approach that accords with reality and is, therefore, most likely to produce a reliable result is to analyze the facts under the government-instigation prong to determine whether the criminal conduct accurately measures the threat to society from the individual defendant, or whether the circumstances suggest that the defendant, if left alone, would not have engaged in the criminal conduct. I would recognize a government-misconduct defense that bars prosecution where the evidence has been obtained by reprehensible conduct, objectively evaluated.

I have opted to align myself with the instigation analysis of the lead opinion because to leave the Court in its divided posture is to do, perhaps, greater damage to the Court and the jurisprudence than I fear from either of the new "objective" tests. I cannot agree, however, that either the

---

evidence presented regarding Juillet's limited intelligence during the entrapment hearing.

[29] The trial court concluded that Bleser did exploit Juillet's vulnerabilities (by smoking marijuana with him and using his superior intelligence and training) to induce him to sell PCP to an undercover agent. The trial court noted that Bleser had smoked marijuana with Juillet and had "causally orchestrated the entire transaction . . . ." We do not reach the propriety of this finding and conclusion since it is not before the Court.

government or the defendants should be punished
or should benefit from the fortuity of the various
tests announced today. I would, therefore, reverse
the decisions of the Court of Appeals and remand
*Brown* and *Juillet* to the trial court for further
proceedings.[30] I recognize that both the defendants
and the government have a legitimate interest in
the long delayed resolution of these cases. In my
view, however, giving each an opportunity to for-
mulate their positions around the opinions issued
today better serves both their respective interests
and that of the jurisprudence, than to say one side
wins or loses because of a failure to perceive the
evolution of the "objective test" of *Jamieson* or the
penumbras its shadow casts today.

GRIFFIN, J. (*concurring in part and dissenting in
part*). While I concur in the opinion of Justice
BRICKLEY as it relates to *Brown,* I disagree with
my colleague, Justice BRICKLEY, regarding the re-
sult in *Juillet.* I do not find, even under the
"objective" test as explained today by Justice
BRICKLEY, that Juillet has met the burden re-
quired for the defense of entrapment.

In addition, I write separately to reiterate my
adherence to views I expressed in *People v Jamie-
son,* 436 Mich 61, 98; 461 NW2d 884 (1990). As I
see it, the "guidance" provided to the bench and
bar by the variety of opinions issued today serves
only to demonstrate why entrapment should not
be recognized as a defense unless the circum-
stances rise to the level of a constitutional due
process violation. As I said in *Jamieson,* 436 Mich
98:

---

[30] I wish to make clear, in connection with the misconduct question,
that I disassociate myself from the unnecessary dicta of the Chief
Justice that the entrapment doctrine is rooted in the Due Process
Clause of the Michigan Constitution.

Unless police conduct in a given situation is so reprehensible as to violate constitutional standards imposed by the Due Process Clause, I do not believe that one who is guilty of committing a criminal act should be exonerated by the judiciary simply because it disapproves of conduct on the part of another branch of government. While constitutional limitations must be strictly observed, it is my view that the defense of entrapment, which has no constitutional base whatever, should be eliminated. Short of that, we should at least move to the "subjective" standard for judging entrapment, a position already taken by courts in the federal system and in the overwhelming majority of our sister states.